Jeffrey B. COHEN, and IDG Companies, LLC., Non–Parties Below, Appellants,

v.

STATE of Delaware, ex. rel. The Honorable Karen Weldin STEWART, CIR–ML, Insurance Commissioner of the State of Delaware, Petitioner–Below, Appellee,

and

Indemnity Insurance Corporation, RRG, Respondent Below, Appellee.

In the Matter of the Rehabilitation of Indemnity Insurance Corporation, RRG.

Nos. 545, 2013, 621, 2013.

Supreme Court of Delaware.

Submitted: March 5, 2014.

Decided: April 9, 2014.

Theodore A. Kittila, Esquire (argued), Greenhill Law Group, LLC, Wilmington, Delaware, for Appellants Jeffrey B. Cohen, IDG Companies, LLC, and RB Entertainment Ventures, LLC.

W. Harding Drane, Jr., Esquire (argued), and Jessica M. Willey, Esquire, of the Department of Justice, Wilmington, Delaware, for Appellee State of Delaware.

Michael W. Teichman, Esquire, Michael W. Arrington, Esquire, James D. Nutter, Esquire, Elio Battista, Jr., Esquire, Parkowski, Guerke & Swayze, P.A., Wilmington, Delaware, for Appellee Indemnity Insurance Corporation, RRG.

Before STRINE, Chief Justice, HOLLAND, BERGER, JACOBS, and RIDGELY, Justices, constituting the Court en banc.

STRINE, Chief Justice:

## I. INTRODUCTION

Central to this appeal, which challenges multiple orders issued by the Court of Chancery, is one issue: whether the delinquency proceedings for Indemnity Insurance Corporation, RRG ("Indemnity") violated the constitutional due process rights of Appellant Jeffrey B. Cohen ("Cohen") or Co–Appellant RB Entertainment Ventures ("RB Entertainment"). We conclude that no violation of those parties' due process rights occurred.

RB Entertainment is one of a complicated web of at least seventeen different companies that Cohen allegedly owns and controls (the "Cohen-affiliated entities"). Co–Appellant IDG Companies, LLC ("IDG"), Indemnity's managing general agent,[1] is also one of the Cohen-affiliated entities. After uncovering evidence that Cohen had committed fraud in his capacity as Indemnity's CEO and that Indemnity might be insolvent, the Delaware Insurance Commissioner (the "Commissioner") petitioned the Court of Chancery for a seizure order. The Delaware Uniform Insurers Liquidation Act (the "Insurers Liquidation Act") authorizes the Commissioner to obtain a seizure order to protect the interests of policyholders and creditors and to prevent further depletion of the insurer's assets.[2] Based on the detailed allegations and supporting evidence presented by the Commissioner, the Court of Chancery granted that seizure order, which, among other things, prohibited anyone with notice of the proceedings from transacting the business of Indemnity, selling or destroying Indemnity's assets, or asserting claims against Indemnity in other venues without permission from the Commissioner. The seizure order also prohibited anyone with notice of the proceedings from interfering with the Commissioner in the discharge of her duties.

Cohen, who founded Indemnity and had served as its President, Chairman, and CEO, resigned from Indemnity's board during the ensuing investigation and the board removed him from his managerial positions. After his resignation, Cohen interfered with the Commissioner's lawful efforts to operate Indemnity in various ways. As Cohen's misbehavior escalated, Indemnity and the Commissioner returned

---

1. 18 *Del. C.* § 1802(3) defines "managing general agent" as "any person, firm, association or corporation who negotiates and binds ceding reinsurance contracts on behalf of an insurer or manages all or part of the insurance business of an insurer (including the management of a separate division, department or underwriting office) and acts as an agent for such insurer. . . ."

2. 18 *Del. C.* § 5943.

to the Court of Chancery several times, first seeking an amendment to the seizure order to address Cohen's behavior and then seeking sanctions against him. The Court of Chancery entered a series of orders that, as Cohen's ongoing disruptive actions justified, increased the restrictions on Cohen's behavior and imposed stiffer sanctions upon him.

Cohen argues that he was denied due process at several junctures during the Court of Chancery proceedings. Because Cohen's claims allege violations of his right to due process, the focus of this opinion is on whether Cohen was given notice of the allegations against him and a fair opportunity to present his side of the dispute. Having carefully examined the record in this case, we conclude that he was.

At oral argument, Cohen's counsel emphasized what he considered to be his client's strongest claim: that Cohen was not provided with a copy of the transcript from a brief hearing that, as authorized by § 5904 of the Insurers Liquidation Act, occurred ex parte on September 10, 2013. The Court of Chancery directed that the transcript be provided to Cohen by counsel for the Commissioner, but it was not. Cohen argues that the transcript contained a critical reference to criminal contempt that would have altered his approach to the case and changed his decision not to attend the hearing to show cause on September 24, 2013. Cohen claims that his absence from the September 24, 2013 hearing put him at a permanent disadvantage that tainted all subsequent sanctions proceedings.

But, Cohen was on abundant notice of the allegations against him and the transcript contained no new information that had not already been provided to Cohen by (i) Indemnity's September 9, 2013 motion, supporting exhibits, and proposed order; and (ii) the Court of Chancery's September 10, 2013 Amended Seizure Order. The Court of Chancery made it clear that a hearing would be held to give Cohen a chance to show cause why he should not be held in civil or criminal contempt. Cohen was represented by counsel at the hearing on September 24, 2013 and had a full and fair opportunity to respond to the allegations against him. Thus, after weighing the factors set out by the U.S. Supreme Court in *Mathews v. Eldridge*,[3] we conclude that although the failure to provide the transcript was unfortunate and regrettable, it did not constitute a due process violation.

Likewise, we conclude that Cohen's due process rights were respected throughout the remainder of the Court of Chancery proceedings, and that the Court of Chancery did not abuse its discretion when it denied Cohen's motion for reargument of one of its orders. We also find that the Court of Chancery's decision not to delay the entry of a rehabilitation order that the Commissioner proposed and Indemnity's board consented to in order to protect the remaining value of the company and avoid liquidation—in response to a letter from RB Entertainment asking for time to brief a renewed motion to intervene—did not deny RB Entertainment its due process rights. The letter from RB Entertainment did not deny that serious fraud had occurred, did not proffer any evidence that Indemnity was not in the precarious financial situation that the Commissioner and Indemnity's board indicated, and made no offer to provide back-stop financing to Indemnity to ensure that no harm from the delay would befall it and its policyholders and creditors. Given the important public policy interests served by the Commissioner's proposed order and the opportunity

---

**3.** 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

afforded by the Court of Chancery for objections to the rehabilitation plan, RB Entertainment suffered no denial of its due process rights. Thus, we affirm the decisions of the Court of Chancery.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Indemnity is a Delaware-domiciled risk retention group that sells liability policies to restaurants and nightclubs, as well as insurance for special events. Indemnity insures approximately 4,100 policyholders and processes approximately 4,500 claims per year.[4] Indemnity wrote over $35 million in hospitality premiums during the 2012 calendar year.[5] Indemnity is subject to the regulatory authority of the Delaware Department of Insurance (the "Insurance Department"), which is charged with protecting insurance consumers, making sure that insurance companies are able to pay claims, and prosecuting insurance fraud.[6]

Indemnity shares its offices with at least seventeen Cohen-affiliated entities, which are intertwined, have complicated financial relationships with each other, and share employees and equipment. Before the spring of 2012, one of the Cohen-affiliated entities, IDG, performed "essentially all" of the day-to-day operations for Indemnity, including providing employees, paying for utilities, and other services.[7] Then, around April 2012, Cohen changed this arrangement and transferred these operational functions, including the employees, to Indemnity, but the companies remained interrelated.[8] For example, although by 2013 Indemnity was paying for at least some of the utilities itself, some accounts remained in IDG's name.[9]

In July 2012, the Insurance Department began a routine regulatory examination of Indemnity. From the beginning, Cohen allegedly refused to cooperate with the Insurance Department's requests for information.[10] During the examination, concerns emerged about Indemnity's solvency when the Insurance Department discovered (i) a receivable to Indemnity from Cohen-controlled affiliate IDG for approximately $20 million that was likely uncollectible, (ii) an unsubstantiated representation that Indemnity was entitled to recover $983,000 of incurred insurance losses from a reinsurer, and (iii) indications that Indemnity's booked reserves

---

4. Indemnity's Opposition Statement (Aug. 21, 2013), docket 66, at *4.

5. RB Entertainment's Opposition Statement (Aug. 21, 2013), docket 65, at *5.

6. *Mission*, DEL DEP'T OF INS., http://www.delawareinsurance.gov/mission.shtml (last updated May 15, 2012).

7. Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 12:18–22.

8. Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 13:2–22.

9. Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 51:10–22; 58:7–9.

10. Seizure Petition (May 30, 2013), docket 1, ¶ 10 (alleging that "the Department's examiners uncovered several areas of high concern regarding [Indemnity]'s financial condition that they were prevented from confirming and quantifying due to the failure of [Indemnity]'s Cohen to cooperate with the examiners' request for information and Cohen's direction to [Indemnity]'s vendors not to cooperate with the Department"); *see also id.* ¶ 63 (alleging "Cohen's use of these actions and practices to obstruct and mislead the [Insurance] Department in its effort to confirm assets of [Indemnity] as part of examining its financial condition" and "the persistent efforts of [Indemnity] and its president and director, Cohen, to resist and thwart the Department's ongoing attempt to examine [Indemnity] since the summer of 2012").

were understated by between $1 million and $3 million.[11] The $20 million receivable was of particular concern, because—for an insurer like Indemnity that had written $35 million in premiums in 2012—that was a material amount. The receivable existed because, over a three-year period, IDG had been collecting premiums on Indemnity's behalf but had not remitted those premiums to Indemnity.[12] After reviewing IDG's financial statements, which Cohen had submitted, the Commissioner concluded that IDG was insolvent because its total assets were only $3 million while its total liabilities exceeded $24 million, and that it was unlikely that Indemnity would ever receive the money IDG owed to it.[13]

In both the Petition for Entry of a Confidential Seizure and Injunction Order (the "Seizure Petition") and the Petition for Entry of a Liquidation and Injunction Order (the "Liquidation Petition"), the Commissioner alleged that in spring 2013, as part of the ongoing inquiry by the Insurance Department, Cohen represented that Indemnity had $5,100,000 in unencumbered cash in an account at Susquehanna Bank.[14] When the Insurance Department sought to verify that amount, Cohen submitted a form that appeared to have been faxed from Susquehanna Bank confirming the account balance.[15] The Insurance Department suspected that this form was fraudulent and followed up by attempting to contact the Susquehanna Bank representative who purportedly had signed the form.[16] Cohen thwarted the Insurance Department's inquiries by providing a false post office box, telephone number, fax number, and email address for that representative.[17] When the Insurance Department finally succeeded in contacting the Susquehanna Bank representative, she confirmed its suspicions that the signature on the form Cohen submitted was not hers.[18] The Insurance Department's investigation later revealed that the actual account balance did not match the amount disclosed in Indemnity's financial statements, and—contrary to Cohen's assertions—the cash in the account represented the proceeds of a loan that another Cohen-controlled affiliate, RBE Entertainment, had taken out and that cash was fully encumbered by the loan.[19]

The Insurance Department's evidence suggested that the fraudulent activity at Indemnity was not limited to the account at Susquehanna Bank. The Insurance Department's investigation uncovered a similar scheme involving an account allegedly held at Royal Bank of Canada—Barba-

11. Seizure Petition (May 30, 2013), docket 1, ¶ 11.

12. Seizure Petition (May 30, 2013), docket 1, ¶ 11.

13. Seizure Petition (May 30, 2013), docket 1, ¶¶ 14–15; Liquidation Petition (July 26, 2013), docket 20, ¶¶ 29–32.

14. Seizure Petition (May 30, 2013), docket 1, ¶ 16; Liquidation Petition (July 26, 2013), docket 20, ¶¶ 38–39.

15. Seizure Petition (May 30, 2013), docket 1, ¶¶ 18, 22–32; Liquidation Petition (July 26, 2013), docket 20, ¶¶ 41, 45–61.

16. Seizure Petition (May 30, 2013), docket 1, ¶ 33; Liquidation Petition (July 26, 2013), docket 20, ¶ 62.

17. Seizure Petition (May 30, 2013), docket 1, ¶¶ 34–36, 38–42, 48; Liquidation Petition (July 26, 2013), docket 20, ¶¶ 63–65, 68–71, 79.

18. Seizure Petition (May 30, 2013), docket 1, ¶¶ 37, 43; Liquidation Petition (July 26, 2013), docket 20, ¶¶ 66, 72.

19. Seizure Petition (May 30, 2013), docket 1, ¶¶ 49; Liquidation Petition (July 26, 2013), docket 20, ¶¶ 97–102.

dos,[20] as well as additional misrepresentations in Indemnity's financial statements that hid its true financial condition, including insufficient reserves, overstated account balances, and reinsurance claims that could not be corroborated.[21] The discovery of these potential frauds fueled the Insurance Department's concerns about Indemnity's financial viability.

▪ Insurer insolvency is regulated by state law rather than the federal Bankruptcy Code.[22] Many states, including Delaware, have adopted a form of the Uniform Insurers Liquidation Act "to avoid the confusion inherent in the forced liquidation of a multistate insurance corporation, especially with regard to assets in foreign jurisdictions."[23] The General Assembly enacted the Delaware Uniform Insurers Liquidation Act (the "Insurers Liquidation Act") in 1953.[24] Section 5943 of the Insurers Liquidation Act provides that, "[u]pon the filing by the Commissioner in the Chancery Court of a petition" meeting the statutory requirements, the Court of Chancery may:

issue forthwith, *ex parte and without a hearing*, the requested order which shall direct the Commissioner to take possession and control of all or a part of the property, books, accounts, documents and other records of an insurer and of the premises occupied by it for the transaction of its business, and until further order of the Court enjoin the insurer and its officers, managers, agents and employees from disposition of its property and from transaction of its business except with the written consent of the Commissioner.[25]

The Insurance Department filed the Seizure Petition because of its concerns about Indemnity's financial viability and its suspicion that Cohen had engaged in fraud. The Court of Chancery reviewed the Seizure Petition, found it to be supported by sufficient evidence, and granted the Confidential Seizure and Injunction Order (the "Seizure Order") on May 30, 2013. The Seizure Order, tracing the language of the Insurers Liquidation Act, instructed the Commissioner to take immediate control of Indemnity and vested the Commissioner with "all right, title and interest in, of or to, all of the property of [Indemnity]."[26]

The Commissioner later determined that Indemnity was "impaired, or insolvent or

**20.** Liquidation Petition (July 26, 2013), docket 20, ¶¶ 84–96.

**21.** Liquidation Petition (July 26, 2013), docket 20, ¶¶ 118–136.

**22.** *Checker Motors Corp. v. Exec. Life Ins. Co.,* 1992 WL 29806, at *2 (Del.Ch. Feb. 13, 1992) ("Because distressed insurance companies are prohibited from seeking the protection of the Federal Bankruptcy Code, the rehabilitation or liquidation of such insurers is left to regulation by the states.").

**23.** Jay M. Zitter, *Validity, construction, and application of Uniform Insurers Liquidation Act,* 44 A.L.R.5th 683 (1996); *see also Checker Motors Corp. v. Exec. Life Ins. Co.,* 1992 WL 29806, at *2 (Del.Ch. Feb. 13, 1992) (noting that "[b]ecause most large insurance companies have assets and operations in more than one state, many states, including California and Delaware, have adopted the [Uniform Insurers Liquidation Act] to establish a uniform method for processing claims against, and distributing assets of, distressed insurance companies."); STEVEN PLITT, DANIEL MALDONADO, JOSHUA D. ROGERS & JORDAN R. PLITT, COUCH ON INSURANCE § 6:14 (3d ed. 2013) (explaining that the Uniform Insurers Liquidation Act was "designed to provide consolidated, orderly, and equitable liquidations of multistate insurers and to secure equal treatment for all creditors wherever situated.").

**24.** 18 *Del. C.* §§ 5901–5933; 5941–5944.

**25.** 18 *Del. C.* § 5943 (emphasis added).

**26.** Seizure Order (May 30, 2013), docket 4, ¶ 2.

in unsound condition" and that its "further transaction of insurance [was] presently or prospectively hazardous to its policyholders."[27] The Commissioner filed the Liquidation Petition on July 26, 2013, based on the allegations of fraud described above, all of which were supported by extensive evidence.

Cohen resigned from Indemnity's board of directors on August 5, 2013, and the board removed him from all of his officer positions that same day. Cohen has not denied or substantively contested the fraud allegations in the Court of Chancery proceedings.[28] Indemnity did not deny the fraud allegations either.[29] But Indemnity did file an opposition to the Liquidation Petition on August 21, 2013, arguing that Indemnity was not insolvent. Thus, at that time, Indemnity's board still believed that Indemnity was a "profitable business" that was "both solvent and in possession of substantial liquid assets that are sufficient to service [Indemnity]'s operations and pay claims."[30]

## A. RB Entertainment's First Request to Intervene

On August 14, 2013, Cohen-controlled affiliate RB Entertainment moved to intervene under Court of Chancery Rule 24, seeking to oppose the Liquidation Petition.[31] RB Entertainment is one of the seventeen Cohen-affiliated entities. Cohen claims to own 100 percent of RB Entertainment, and RB Entertainment in turn claims to own 99 percent of Indemnity's equity.[32] RB Entertainment sought to in-

---

27. 18 *Del. C.* § 5905(1).

28. Indemnity has brought an action against Cohen in the Delaware District Court alleging breach of fiduciary duty and fraud, and in an Answer filed on November 12, 2013, Cohen's response to the specific allegations of fraud was: "Cohen asserts a privilege not to respond to the allegations contained in this paragraph." *See* Appellee's Appendix B531–33, 535, 539, 541, ¶¶ 17–19, 21, 23, 29–30, 41, 52–53.

29. Indemnity's Opposition Statement (Aug. 21, 2013), docket 66, at *1 ("[Indemnity] cannot offer, and is unaware of, any evidence to refuse allegations made by [the Insurance Department] in its petition that Cohen provided false information...."); *id.* at *5 (stating that "[Indemnity] has identified no evidence suggesting that Mr. Cohen was not responsible for the false Susquehanna bank confirmation or the representations to the [the Insurance Department] concerning an account at Royal Bank of Canada—Barbados" and noting "the lack of any exculpatory evidence").

30. Indemnity's Opposition Statement (Aug. 21, 2013), docket 66, at *2.

31. RB Entertainment acknowledged that its motion was not accompanied by the pleading required by Rule 24(c), but requested that it be excused from compliance because the re-quired pleading would be duplicative of the one that was due on August 21, 2013. The Commissioner argued that this did not comply with Rule 24(c) in its Opposition to Intervention filed on August 19, 2013. After RB Entertainment filed its reply, it filed the required pleading on August 21, 2013. The hearing regarding intervention was held the next day, on August 22, 2012, and the Court of Chancery made no determination as to whether the belatedly-filed pleading satisfied Rule 24(c).

32. Cohen claims that he owns 99 percent of Indemnity's equity through RB Entertainment, as a result of having been issued a zero-dollar insurance policy by Indemnity. *See* Memorandum Opinion (Jan. 16, 2014), docket 339, at *3. The Commissioner disputes this characterization and argues that RB Entertainment does not qualify as a statutory owner of Indemnity under the Delaware Risk Retention Act, 18 *Del. C.* §§ 8001–8014. Indemnity's board also disputes the claim and says that there is no record that Indemnity ever issued stock to RB Entertainment or anyone else in exchange for genuine economic consideration. *See* Rehabilitation Petition (Nov. 6, 2013), docket 228, at 15 n. 10; Unanimous Written Consent of the Directors of Indemnity, Exhibit A to Exhibit 2 to Commissioner's Rehabilitation Petition (Nov. 6, 2013), docket 228, ¶ 10. This issue has not been adjudicated by the Court of Chancery.

tervene based on its alleged status as Indemnity's controlling stockholder. As discussed above, the Commissioner alleged that Cohen used RB Entertainment as an instrumentality to perpetrate at least one of the frauds, by causing RB Entertainment to take out a loan to provide the funds that were later deposited into the Indemnity account at Susquehanna Bank and were falsely represented as unencumbered.

RB Entertainment's motion to intervene argued that Indemnity was solvent but did not contest the fraud allegations. Both Indemnity and the Commissioner opposed RB Entertainment's motion. The Court of Chancery held an office conference on RB Entertainment's motion on August 22, 2013 and denied it without prejudice. But the Court of Chancery, citing the Insurers Liquidation Act and other authority,[33] held that as a general matter, stockholders do not have any official role as parties in a delinquency proceeding, because the insurer's interests are protected and represented by the insurer's board of directors.[34] The Court of Chancery also emphasized that it had not yet adjudicated any of the fraud claims, stating that "before we determine that Mr. Cohen is a bad guy, he actually ought to be able to dispute the fact that he's a bad guy."[35] The Court of Chancery stated that:

If it turns out that the State wants some remedy that would deprive [RB Entertainment] of its voting rights or other[wise] affect its unique rights as a stockholder, I would reconsider and I would give Mr. Cohen, or really [RB Entertainment], the ability to intervene for the purpose of litigating its own particular rights. Likewise, I think that if the issue of fraud is to be adjudicated . . . and if that adjudication would then, in turn, be binding upon [RB Entertainment], then I would allow [RB Entertainment] to intervene solely for the purpose of defending against an adjudication that would be dispositive of its rights.[36]

But the Court of Chancery added that:

Even if I allowed [RB Entertainment] to intervene, it would only be for that limited purpose. So it's not going to be for the purpose of arguing about valuation. It's not going to be for the purpose of arguing about solvency. It's not going to be for the purpose of arguing about business viability. Those are all issues that are now within the control of the board of [Indemnity]. The board gets to decide what arguments it wants to make, not Mr. Cohen.[37]

The Court of Chancery asked RB Entertainment's counsel whether it wanted "the

**33.** 18 *Del. C.* § 5903 ("The Commissioner shall commence any such proceedings by application to the court for an order directing *the insurer* to show cause why the Commissioner should not have the relief prayed for.") (emphasis added); *see also Metcalf v. Investors Equity Life Ins. Co.*, 80 Hawai'i 339, 910 P.2d 110 (1996) (stockholder did not have standing to oppose liquidation petition); *Hartnett v. Southern American Fire Ins. Co.*, 495 So.2d 902, 903 (Fla.App.1986) (stockholders of insolvent insurance corporation sought to challenge receiver's actions, but were denied due to lack of standing); *cf. In re Westerleigh Dev. Corp.*, 141 B.R. 38 (Bankr. S.D.N.Y.1992) (no right for stockholders to

contest an involuntary petition filed against their corporation in analogous bankruptcy proceeding).

**34.** Transcript from Office Conference (Aug. 22, 2013), docket 73, at 34:5–39:24.

**35.** Transcript from Office Conference (Aug. 22, 2013), docket 73, at 24:10–21.

**36.** Transcript from Office Conference (Aug. 22, 2013), docket 73, at 38:7–18.

**37.** Transcript from Office Conference (Aug. 22, 2013), docket 73, at 38:9–39:5.

opportunity to seek to intervene to oppose the fraud issue" and RB Entertainment's counsel responded, "I think that's something to be discussed."[38] RB Entertainment did not seek reconsideration of the denial of intervention by demonstrating any specific interest that had been impaired or by contesting the fraud allegations. RB Entertainment has not appealed the Court of Chancery's August 22, 2013 decision to deny intervention, and thus the resolution of that motion is not before us. And, to reiterate, at no time has Cohen personally sought to intervene in the delinquency proceedings to contest the fraud allegations.

### B. The Amended Seizure Order of September 10, 2013

The Seizure Order entered by the Court on May 30, 2013 prohibited anyone with notice of the proceedings "from transacting any business of, or on behalf of, [Indemnity] or selling, transferring, destroying, wasting, encumbering or disposing of any of the Assets, without the prior written permission of the Commissioner."[39] Persons with notice of the proceedings were also prohibited "from interfering with the Commissioner and her authorized agents either in their possession and control of the Assets or in the discharge of their duties hereunder."[40] Despite those prohibitions, the record below reveals that Cohen interfered with the Commissioner's investigation and ability to run Indemnity in a variety of ways.

In response, Indemnity filed an expedited motion to amend the Seizure Order on September 9, 2013.[41] The motion set out detailed allegations that Cohen had (i) accessed Indemnity's computer servers and monitored company email, (ii) sent emails disparaging Indemnity's new management to company employees and insurance brokers, (iii) sent threatening text messages to members of management, and (iv) disclosed confidential documents to the ratings agency A.M. Best, which resulted in a ratings downgrade of Indemnity. The motion also provided affidavits and documentary evidence to support those serious allegations. Attached to the motion was a proposed order which would have, among other things, enjoined Cohen from accessing Indemnity's information technology systems or discussing Indemnity's business matters with employees or business contacts, and would have imposed criminal contempt sanctions on Cohen for any violation of the order. Indemnity's motion, proposed order, and supporting exhibits were served on Cohen's counsel that same day.

Because of the expedited nature of the motion and to protect the interests of the policyholders and creditors of Indemnity, the Court of Chancery held an ex parte office conference on the motion the next day, on September 10, 2013, as authorized by the Insurers Liquidation Act.[42] The office conference began at 12:39 PM and

---

38. Transcript from Office Conference (Aug. 22, 2013), docket 73, at 33:10–14.

39. Seizure Order (May 30, 2013), docket 4, ¶ 7.

40. Seizure Order (May 30, 2013), docket 4, ¶ 9.

41. Expedited Motion to Amend Seizure Order (Sept. 9, 2013), docket 82.

42. 18 *Del. C.* § 5904(a) states that "the court may *without notice* issue an injunction restraining the insurer, its officers, directors, stockholders, . . . and all other persons from the transaction of its business or the waste or disposition of its property. . . ." and § 5904(b) states that "[t]he court may *at any time* during a proceeding under this chapter issue such other injunctions as may be deemed necessary to prevent interference with the Commissioner. . . ." (emphasis added).

lasted for approximately 20 minutes. The Court of Chancery did not grant Indemnity's proposed order in the form submitted, but instead made several modifications to make it more protective of Cohen's interests. First, the Court of Chancery narrowed the scope of the restraint out of concern that the proposed order was "overbroad" and might infringe on Cohen's individual rights.[43] Second, the Court of Chancery modified the order so that *either* civil or criminal sanctions could be imposed for violations of the order, instead of *only* criminal sanctions as Indemnity's proposed order suggested.[44] Third, the Court of Chancery added language that provided Cohen an opportunity to respond and show cause why he was not in contempt of the Seizure Order,[45] stating that *"we have to hold out the possibility that there's some good explanation for all this."* [46]

Then, after finding that "[t]here is certainly sufficient evidence attached to the motion in the form of affidavits as well as supporting documents to raise more than a colorable claim that types of improper access and interference have occurred," [47] the Court of Chancery entered an order amending the Seizure Order (the "Amended Seizure Order") at 4:11 PM. The Amended Seizure Order enjoined Cohen from "discussing, disclosing or communicating with or to [Indemnity]'s employees or any persons or entities that Cohen knows have business relationships with [Indemnity] regarding (i) any matter or fact relating to the Seizure Order or other matters contained in filings under this docket or (ii) any matter relating to [Indemnity]'s business." [48] The Amended Seizure Order was served on Cohen's counsel on September 10, 2013.

At the conclusion of the office conference, the Court of Chancery told the Commissioner to provide Cohen with a copy of the transcript, "so that [Cohen is] clear what his obligations are." [49] The full transcript is only 20 pages long. Unfortunately, counsel for the Commissioner did not comply with the Court of Chancery's instructions, and Cohen did not receive a copy of the transcript until January 15, 2014. Nonetheless, the Amended Seizure Order—when read in context with Indemnity's motion, the proposed order, and the supporting exhibits—provided Cohen with substantive knowledge of all the serious charges against him. Specifically, the Amended Seizure Order stated that:

4. Persons found in violation of this amendment to the Seizure Order may be held in *civil or criminal contempt* and, subject to the limits of applicable law, such persons may be sanctioned as the

---

43. Transcript from Office Conference (Sept. 10, 2013), docket 381, at 9:13–10:11 ("I understand you want the most protection you can from the company. But I have to balance that against the idea that Mr. Cohen does continue to have individual rights as well.").

44. Transcript from Office Conference (Sept. 10, 2013), docket 381, at 16:5–17 ("I'm also going to modify paragraph 3 to make it clear that contempt can be civil or criminal … [and] that contempt does not follow as a matter of course.... [I]t's not appropriate for me to put in here that anybody who violates this shall be held in criminal contempt. That's just too strong.").

45. Transcript from Office Conference (Sept. 10, 2013), docket 381, at 16:18–22.

46. Transcript from Office Conference (Sept. 10, 2013), docket 381, at 18:1–2 (emphasis added).

47. Transcript from Office Conference (Sept. 10, 2013), docket 381, at 12:17–21.

48. Amended Seizure Order (Sept. 10, 2013), docket 85, ¶ 2.

49. Transcript from Office Conference (Sept. 10, 2013), docket 381, at 17:2–5.

Court, in its discretion, may determine is warranted under the circumstances. 5. Cohen should show cause on or before September 24, 2013, why by accessing [Indemnity]'s information and technology systems he is not in contempt of paragraphs 7 and 9 of the Seizure Order.[50]

## C. The Sanctions Order of September 25, 2013

The same day that the Amended Seizure Order was issued, management at Indemnity held a meeting with all employees. An unidentified Indemnity employee secretly recorded the meeting and delivered the recording to Cohen, who then sent a text message to a member of Indemnity's board stating that he had the recording and threatening litigation. As a result of this conduct, Indemnity filed a motion for sanctions on September 12, 2013, arguing that Cohen was in violation of paragraph 9 of the Seizure Order and paragraph 2 of the Amended Seizure Order, and requesting at least $30,000 in sanctions.[51] The Court of Chancery ordered briefing on both the Amended Seizure Order and the new motion for sanctions, and scheduled a hearing for September 24, 2013 where Cohen could present evidence on both issues.[52]

Indemnity alleged in its reply brief that, while the motion was being briefed, Cohen continued to interfere with Indemnity in other ways. On September 13, 2013, three Indemnity employees became aware of unauthorized activity in their deferred-compensation accounts. Cohen was the only person with access to the accounts, which were held in IDG's name. IDG is the Cohen-affiliated entity that owes Indemnity $20 million. The stock in the accounts had been sold and converted to cash, and the employees were concerned that Cohen was preparing to withdraw the funds. The employees contacted the Insurance Department, and the Commissioner froze the three accounts before they could be emptied.[53] Cohen sent the Commissioner a letter on September 19, 2013 demanding that the accounts be released, noting that IDG is not regulated by the Insurance Department. Cohen admitted that he attempted to cash out the employees' accounts, but claimed that he was seeking to offset a large payable that Indemnity owed IDG and that the plan's documents permitted him to do so.[54]

Then, on September 19, 2013, the telephone service in Indemnity's office went dead. When Indemnity contacted Verizon about the problem, Verizon informed it

**50.** Amended Seizure Order (Sept. 10, 2013), docket 85, ¶¶ 3–4 (emphasis added).

**51.** Indemnity's Expedited Motion for Sanctions (Sept. 12, 2013), docket 99, ¶¶ 6–8.

**52.** Order Setting Hearing on Motion for Sanctions and Order to Show Cause (Sept. 13, 2013), docket 117.

**53.** Suspicious activity was also observed in a fourth account, belonging to former Indemnity IT employee Jorge Cuadra ("Cuadra"). Cuadra did not cosign the letter requesting that the Commissioner freeze the accounts. The account was emptied before the Commissioner could freeze it, but Cuadra did not

complain that the money was missing. Cuadra allegedly passed information to Cohen and helped Cohen to access Indemnity's servers before he quit in August 2013. Cuadra also signed an affidavit on Cohen's behalf on October 14, 2013, after the account had been emptied, alleging that Indemnity had violated labor laws by withholding wages that were due to him and that management at Indemnity had created a hostile work environment. *See* Exhibit H to Verified Petition (Oct. 18, 2013), docket 181. It is not known whether Cuadra now works at one of the other Cohen-affiliated entities or where the money went.

**54.** Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 30:20–33:8.

that Cohen had requested to disconnect the telephone service. The telephone service was not in Indemnity's name. Rather, it was in the name of one of Cohen's affiliated entities, and Indemnity needed Cohen's permission to transfer it or would have to open a new account, which would leave Indemnity without telephone service for ten days. Indemnity had similar problems with its electricity and the internet service, which Cohen had also requested be turned off. As a result of this behavior, Indemnity increased its request for sanctions to at least $100,000 in its reply brief filed on September 20, 2013.[55] The serious nature of the allegations against Cohen would have been evident to anyone who read the papers served on Cohen. In fact, Cohen's own attorney acknowledged that in a letter to the Court on September 16, 2013, stating: "We are in receipt of [Indemnity]'s Expedited Motion to Amend Confidential Seizure and Injunction Order *and note the serious allegations it contains.*"[56]

But Cohen chose not to attend the September 24, 2013 hearing. Instead, Cohen simply submitted an affidavit addressing the allegations, providing the Insurance Department with no opportunity to cross-examine him. Cohen's affidavit claimed that Indemnity's offices are leased by IDG, that IDG owned the servers that Indemnity was using, and that the servers "contain all of the data and information for 17 companies that are separate and apart from [Indemnity]."[57] The affidavit also stated that all the Cohen-affiliated entities maintain their financial records on the same software application, which had been purchased by IDG. In other words, Cohen attempted to justify his accessing Indemnity's servers and entering Indemnity's offices by arguing that he had caused Indemnity's core operations—as a regulated insurer—to be intermingled with and dependent on various Cohen-affiliated entities that he claimed to own and control and that he caused to be operated out of the same building as Indemnity.

At the hearing, evidence was presented that demonstrated that Cohen had interfered with the Commissioner by accessing Indemnity's servers. Cohen's counsel had the opportunity to present contrary evidence or deny that Cohen had accessed Indemnity's servers, but did not do so. Instead, relying on Cohen's affidavit, Cohen's counsel argued that Cohen should still be allowed to access the information on the Indemnity servers because the servers were owned by IDG and contained data belonging to the other Cohen-affiliated entities.[58] Cohen's attorneys also argued that Cohen should be allowed into Indemnity's offices to operate IDG and the other Cohen-affiliated entities, and claimed that his inability to do so under the Seizure Order was negatively affecting IDG and the other Cohen-affiliated entities.[59]

55. Indemnity's Reply to: 1) Response to Expedited Motion to Amend Confidential Seizure and Injunction Order and to Show Cause; and 2) Opposition to Motion for Sanctions (Sept. 20, 2013), docket 159, ¶ 18.

56. Letter from Cohen's Counsel to the Court of Chancery (Sept. 10, 2013), docket 84 (emphasis added).

57. Cohen's Affidavit, Exhibit D to Cohen's Response to Amended Seizure Order (Sept. 19, 2013), docket 145, ¶¶ 3–4.

58. Cohen's Response to Amended Seizure Order (Sept. 19, 2013), docket 145, at *12–14 (emphasis added); Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 9:3–5 ("IDG is the actual tenant for that office space. IDG owns all the servers that all the entities utilize.").

59. Cohen's Response to Amended Seizure Order (Sept. 19, 2013), docket 145, at *9 (emphasis added).

In response to this argument by Cohen's counsel, the Court of Chancery asked questions about IDG and the other Cohen-affiliated entities at the September 24, 2013 hearing.[60] Cohen's attorneys were not surprised by these questions, responding, "Thank you, Your Honor. That's something I was itching—have been itching to tell you."[61] Cohen's attorneys acknowledged that "the structure of the companies is important and provides context for these motions."[62] But Cohen's attorneys did not know the specific information necessary to answer many of the Court of Chancery's questions, and Cohen, the one person in the best position to know the details, did not attend the hearing. Cohen's attorneys said that:

> There's a benefit to aggregating all of these employees in the same place so that they can perform overlapping functions for each of these entities because the overhead costs would be substantially greater for each of these entities if they didn't sublease office space from IDG, use their servers, et cetera. . . . You get the picture.[63]

The Court of Chancery responded that "what it also evidences is that these are really one economic unit . . . from what you're telling me there is a high degree of integration, to the point of nigh complete integration, between these businesses at the operational and functional level." The Court of Chancery continued, "there is a legal separation in terms of the intervening holdco ownership; but the intervening holdco ownership is, at most, a blocker entity, because when we get up to it, the ultimate ownership is all Mr. Cohen. Have I gotten that right?" Cohen's counsel answered, "I think that is essentially correct."[64]

In other words, the Court of Chancery focused on the reality that if the facts were as Cohen's counsel represented, then Cohen had intermingled the operations of an insurance company—which had over four thousand policyholders and was subject to regulation by the Insurance Department—with a dog's breakfast of shell entities, one of which appeared to be insolvent and happened to owe Indemnity $20 million. In essence, Cohen was arguing that he should continue to be able to be involved in Indemnity's business, by accessing its computer systems and offices, because he had made Indemnity dependent on dozens of non-transparent entities that he controlled and that he claimed were not subject to regulation by the Insurance Department. Given the important public policy interest of protecting policyholders served by the Insurers Liquidation Act,[65] the Court of Chancery understand-

---

60. *See, e.g.*, Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 4:11–12 ("Tell me about these 17 companies. What do you know about them?"); *id.* at 7:5–9 ("[Cohen's counsel] has just started to tell me about the 17 companies that used the IDG servers and which aren't part of [Indemnity] but yet are implicated by what we may do today."); *id.* at 8:15–23 ("So IDG is the ultimate parent. And the other 16 entities are subsidiaries of IDG? . . . Tell me what you can about these 16 other entities."); *id.* at 9:21–22 ("Do any of these entities have other lines of business that aren't insurance related?"); *id.* at 10:7–20 ("How many employees does IDG and its subsidiaries have? . . . How many of [Indem-

nity]'s employees does IDG utilize on a regular basis?").

61. Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 4:13–15.

62. Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 27:12–14.

63. Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 22:15–23.

64. Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 23:1–16.

65. *Matter of Transit Cas. Co.*, 79 N.Y.2d 13, 580 N.Y.S.2d 140, 588 N.E.2d 38, 42 (1992)

ably rejected Cohen's argument that he should be allowed to benefit from entangling a regulated insurer with his myriad corporations by continuing to disrupt the Commissioner's control of Indemnity. At the hearing, the Court of Chancery stated that it was "not about to allow the legal fig leaf of IDG to prevent the State from exercising its police powers and supervisory and regulatory authority over a Delaware entity." [66]

The next day, September 25, 2013, the Court of Chancery issued an order imposing sanctions (the "Sanctions Order").[67] The Sanctions Order required Cohen to (i) stop interfering with the Commissioner, her agents, or current management at Indemnity; (ii) transfer control of the Indemnity telephone lines and other utilities to the Commissioner; (iii) cease to control IDG; and (iv) conduct all further communication with Indemnity or its employees through counsel. The Sanctions Order also enjoined and restrained IDG from interfering with the Commissioner in the discharge of her duties.[68] Although the Sanctions Order did not require Cohen to pay any damages at that time, to encourage compliance with the order, the Court of Chancery required Cohen to place $100,000 in escrow, which Cohen would forfeit if he continued to violate the Seizure Order. To enable a fuller exploration of the issues Cohen's own argument had injected into the proceedings, the Sanctions Order also directed discovery into

Cohen's net worth and into the corporate separateness of the seventeen Cohen-affiliated entities that were transacting business out of the same premises as Indemnity.

### D. The Denial Of The Rehearing Motion On October 7, 2013

On October 7, 2013, Cohen filed an Expedited Motion to Modify or Alternatively For Relief From the Order Imposing Sanctions (the "Rehearing Motion"). Cohen argued that the Sanctions Order should be modified under Court of Chancery Rule 59(e) to allow Cohen to reassert control over IDG to "avoid irreparable harm to the [Cohen-affiliated] non-party entities and to prevent manifest injustice." [69] In the alternative, Cohen claimed that the September 25, 2013 Sanctions Order should be set aside under Court of Chancery Rule 60(b), because of newly discovered evidence. Without providing any specific details, Cohen alleged that IDG's computer servers were being destroyed or discarded, that Indemnity's attorneys had withdrawn from representing IDG in certain other matters due to alleged conflicts of interest, and that Indemnity was not depositing checks remitted to IDG and was forwarding them to Cohen instead. The only new evidence that Cohen attached was an electric bill to one of the Cohen-affiliated entities dated September 16, 2013, and three letters dated September 17, September 19, and September

("The over-all purpose of the Uniform Act, like liquidation proceedings generally, is not only to preserve available assets for the benefit of creditors, but to protect the interest of persons who purchased insurance policies from a company which has become insolvent.").

66. Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 26:9–12 ("[W]hat your client is doing is clutching the corporate separateness of IDG as a basis for, put bluntly,

interfering with the regulatory efforts of the State.").

67. Sanctions Order (Sept. 25, 2013), docket 161.

68. Sanctions Order (Sept. 25, 2013), docket 161, ¶ 7.

69. Cohen's Rehearing Motion (Oct. 7, 2013), docket 169, at *2.

25, 2013, where Indemnity attorneys had withdrawn as counsel to IDG in separate litigation due to conflicts of interest in representing both entities.

The Court of Chancery denied Cohen's Rehearing Motion without prejudice, noting that "there are no specifics to back [these allegations] up" as well as "no indication that, as to matters such as the [attorney] withdrawals or the depositing of IDG checks, Cohen has made any effort to contact Indemnity and solve the problem before attempting to create an issue for the Court to resolve." [70] The Court of Chancery also noted that the evidence could have been presented at the September 24, 2013 hearing, stating that "[t]he main reason why the Court's questions could not be answered on September 24 was because Cohen chose not to show up for a hearing about whether he was in contempt of an order from this court." [71] Nonetheless, the Court of Chancery gave Cohen leave to renew the motion if "he (i) grounds it on specific[ ] facts and (ii) dem-

onstrates that he has met and conferred with [Indemnity] before seeking relief." [72] Cohen did not refile the motion. Instead, he filed the appeal in Case Number 545, 2013 three days later on October 10, 2013, challenging (i) the Amended Seizure Order of September 10, 2013, (ii) the Sanctions Order of September 25, 2013, and (iii) the denial of the Rehearing Motion on October 7, 2013.

### E. The Additional Sanctions Order of November 1, 2013

■ Cohen's contumacious behavior continued. Cohen filed three lawsuits against Indemnity in the state courts of Maryland (the "Maryland Lawsuits"), two pro se in his individual capacity on October 8, 2013 and the other through IDG and other Cohen-affiliated entities on October 11, 2013. . The filing of the Maryland Lawsuits violated paragraph 10 of the Seizure Order, which, under the authority of § 5904(b) of the Insurers Liquidation Act,[73] enjoined and restrained anyone with

---

70. Order Denying Rehearing Motion (Oct. 7, 2013), docket 170. Cohen nonetheless claims on appeal that he was unable to hire new attorneys and cash the checks for IDG because the provisions in the September 25, 2013 Sanctions Order enjoined him from exercising control over IDG. *See* Cohen's Opening Brief (Nov. 25, 2013), No. 545, at *34. But the Court of Chancery made clear to Cohen that specific issues of this kind could be easily resolved. All Cohen had to do was confer through counsel with Indemnity and work them out. If no resolution was reached, then the Court of Chancery would hear his concerns. There is no rational basis, therefore, to believe that Cohen would not have been permitted to deposit checks into IDG's account or hire attorneys for IDG with IDG's own resources or with his own. But the record reflects no attempt by Cohen to address these kinds of specific issues in the constructive manner that the Court of Chancery suggested.

71. Order Denying Rehearing Motion (Oct. 7, 2013), docket 170 ("Having chosen to send

his lawyers and not appear personally, Cohen cannot complain about their inability to answer questions.").

72. Order Denying Rehearing Motion (Oct. 7, 2013), docket 170.

73. 18 *Del. C.* § 5904(b) ("The court may at any time … issue such other injunctions or orders as may be deemed necessary to prevent … the commencement or prosecution of any actions … against the insurer or against its assets or any part thereof." As Delaware Courts have recognized, one of the main purposes of the Insurers Liquidation Act is to centralize claims in one place "to avoid dissipating a distressed insurer's assets by allowing it to be sued, and requiring it to defend, litigations scattered in many jurisdictions throughout the country.") *Checker Motors Corp. v. Exec. Life Ins. Co.*, 1992 WL 29806, at *2 (Del.Ch. Feb. 13, 1992). This public policy interest has also been recognized as important by other courts. *See, e.g., Munich American Reinsurance Co. v. Crawford*, 141 F.3d 585, 593 (5th Cir.1998) (consolidation in one

notice of the proceedings "from asserting any claim against the Commissioner, her authorized agents, or [Indemnity] ... except insofar as such claims are brought in [ ] these seizure proceedings."[74] Further, the Maryland Lawsuits were not filed under seal and they attached pages of sealed transcripts from the Delaware proceedings, and as a result, Indemnity's identity—and thus, the fear that its financial condition was fundamentally compromised—became public. That violated § 5944(b) of the Insurers Liquidation Act and paragraph 15 of the Seizure Order, which required that Indemnity's identity be kept confidential.[75]

Cohen also violated paragraph 8 of the Seizure Order, which required persons holding Indemnity's assets to "turn those Assets over to the Commissioner" within ten days. Cohen refused to return a 2011 Aston Martin, a 2012 Range Rover, and a 2013 Ford Mustang Shelby GT that Indemnity purchased and held title to, stating that he would not return the vehicles until Indemnity put $30 million in escrow to cover alleged violations of his Employment Agreement related to his termination.

Cohen also continued communicating with Indemnity employees without going through counsel, in violation of paragraph 6 of the Sanctions Order and paragraph 2 of the Amended Seizure Order. On October 15, 2013, Cohen and another former Indemnity employee went to the Indemnity offices—in a Bentley owned by IDG—to serve certain members of management with the Maryland Lawsuits after service by mail had been declined. That caused a commotion at Indemnity's offices and the police were called to supervise the service of process because some employees felt intimidated. On October 17, 2013, Cohen sent a cease and desist letter to the acting president of Indemnity alleging defamation and sent an email to a benefits administrator threatening litigation, both without going through counsel.

In response, Indemnity filed an Expedited Motion for Additional Contempt Sanctions on October 21, 2013. The Court of Chancery held a hearing on the motion on November 1, 2013. The hearing lasted over three hours, and Cohen attended part of the hearing and testified. Cohen admitted that he had filed the Maryland Lawsuits despite knowing of the restrictions in the Seizure Order;[76] had not returned the vehicles, even though Indemnity held title

court "eliminates the risk of conflicting rulings, piecemeal litigation of claims, and unequal treatment of claimants, all of which are of particular interest to insurance companies and policyholders as well as other creditors."); *G.C. Murphy Co. v. Reserve Ins. Co.*, 54 N.Y.2d 69, 444 N.Y.S.2d 592, 429 N.E.2d 111, 117 (1981) (recognizing "the paramount interest of the various States in seeing that insurance companies domiciled within their respective boundaries are liquidated in a uniform, orderly and equitable manner without interference from external tribunals.").

74. Seizure Order (May 30, 2013), docket 4, ¶ 10.

75. 18 *Del. C.* § 5944(b) ("In all summary proceedings and judicial reviews thereof, all rec-

ords of the insurer, other documents and all Insurance Department files and court records and papers ... shall be and remain confidential ... unless and until the Chancery Court ... shall order otherwise...."); Seizure Order (May 30, 2013), docket 4, ¶ 15 ("This Seizure and Injunction Order shall remain confidential except as determined necessary by the Commissioner to protect the Assets and business of [Indemnity], their policyholders, creditors, and stockholders."). Cohen's counsel blamed this disclosure on a "snafu" with the court clerk's office. *See* Cohen's Opening Brief (Dec. 23, 2013), No. 621, at *33 n. 21.

76. Transcript from Oral Arguments (Nov. 1, 2013), docket 419, at 89:7–13, 117:14–118:2.

to them;[77] and had continued to contact Indemnity employees without going through counsel, even though he knew that he was prohibited from doing so by the Sanctions Order and the Amended Seizure Order.[78] Despite being represented by counsel at the time in other matters, Cohen testified that he believed he was permitted to contact the employees because he had filed the Maryland Lawsuits pro se and was therefore acting as his own attorney. The Court of Chancery rejected that testimony as "pretextual," [79] a conclusion well within its discretion. Cohen also testified that he relied on advice from his attorney in Maryland that he was not required to return the vehicles. Cohen left during the lunch break and chose not to attend the remainder of the hearing, which included the Court's ruling on the motion for sanctions.

After the hearing on November 1, 2013, the Court of Chancery issued an order for additional sanctions (the "Additional Sanctions Order"), which included the forfeiture of the $100,000 that Cohen had put in escrow with the Register in Chancery; the return of the three vehicles to Indemnity by an agent before November 4, 2013; and the dismissal of the Maryland Lawsuits before November 8, 2013.[80] The Court of Chancery made it clear that if Cohen had any claims that needed to be brought exclusively in Maryland, he could make an application in Chancery for leave to do so.[81] Cohen did not file any such application. Based on evidence of Cohen's net worth—including documentation showing that Cohen had received over $1 million in compensation from Indemnity for each of the past four years [82]—and the fact that a potential $100,000 sanction had not been effective in convincing Cohen to comply with its orders, the Court of Chancery also ordered Cohen to deposit an additional $500,000 in escrow before November 8, 2013.[83]

Cohen failed to comply with the Additional Sanctions Order. On November 3, 2013, Cohen returned the Aston Martin by parking it across the entrance to Indemnity's parking lot, and he returned the Mustang by parking it on the sidewalk blocking the front entrance to the building. One of the Aston Martin's tires appeared to have been deflated intentionally, but Cohen denied deflating it. Regardless, because Cohen had not returned the keys to either vehicle, both had to be towed away. The Range Rover was not returned until November 14, 2013. The Maryland Lawsuits were not timely dismissed, although they were later dismissed.

In response to this conduct, Indemnity filed another motion for sanctions on November 7, and a hearing was held on December 5, 2013, at which Cohen testified.

77. Transcript from Oral Arguments (Nov. 1, 2013), docket 419, at 92:13–22; 121:15–22.

78. Transcript from Oral Arguments (Nov. 1, 2013), docket 419, at 82:14:19.

79. Transcript from Oral Arguments (Nov. 1, 2013), docket 419, at 118:13–119:3; 160:15–161:23.

80. Additional Sanctions Order (Nov. 1, 2013), docket 217.

81. Transcript from Oral Arguments (Nov. 1, 2013), docket 419, at 162:11–162:17.

82. *See* Transcript from Oral Arguments (Nov. 1, 2013), docket 419, at 44:16–45:20, 135:1–15; Exhibit D to Cohen's Response to Expedited Motion for Additional Contempt Sanctions (Oct. 29, 2013), docket 199, ¶ 28 (claiming that Cohen's Employment Agreement entitles him to a salary of $1,300,000 per year, plus bonus, benefits, and significant perquisites).

83. Cohen has not posted the $500,000 security, because he claims that he cannot afford to do so.

On January 2, 2014, the Court of Chancery imposed additional sanctions of $33,331, plus towing costs for these violations.[84] In an illustration of its restraint in the face of inexcusable behavior, the Court of Chancery refused to impose any additional sanctions for the flat tire because it could not be certain that Cohen was responsible.

### F. The Rehabilitation Order and RB Entertainment's Second Request to Intervene

On November 6, 2013, the Commissioner filed a Petition for Entry of Rehabilitation and Injunction Order by Consent (the "Rehabilitation Petition"). The Rehabilitation Petition alleged two independent statutory grounds for entry of a rehabilitation order. First, based on the substantial evidence that the Commissioner collected during the investigation, the Rehabilitation Petition alleged that Indemnity was "impaired, insolvent, in unsound condition, and in or using such condition as to render its further transaction of insurance presently and prospectively hazardous to its policyholders."[85] In such circumstances, the Court of Chancery is authorized to enter a rehabilitation order by § 5905(1) of the Insurers Liquidation Act.[86] Second, Indemnity's board—which had previously opposed the Liquidation Petition—now consented to the Rehabilitation Petition.[87] In its unanimous written consent to the entry of a rehabilitation order, Indemnity's board stated that "[a]t the time the Opposition Statement was filed, the Company's Board of Directors did not fully grasp the true depth and extent of the frauds that Cohen appears to have perpetrated, *or the true financial position* of [Indemnity]."[88] The consent of Indemnity's board thus provided the Court of Chancery with independent statutory grounds to enter a rehabilitation order under § 5905(9) of the Insurers Liquidation Act.

Indemnity's board and the Commissioner emphasized the need for the Court of Chancery to grant the Rehabilitation Petition swiftly. Indemnity had negotiated a potential transaction with AmTrust North America, Inc., a large insurance holding company, that might allow it to avoid liquidation, and it feared the transaction would fall apart if the Court of Chancery did not move with alacrity.[89] In addition, on October 29, 2013, Bloomberg Newsweek published an article about the Commissioner's seizure of Indemnity, based on information obtained from the Maryland Lawsuits that Cohen had filed in violation of paragraph 10 of the Seizure Order.[90] The article

84. Memorandum Opinion on Contempt (Jan. 2, 2014), docket 305, at *22.

85. Rehabilitation Petition (Nov. 6, 2013), docket 228, at *25.

86. *See* 18 *Del. C.* § 5905 (setting forth the statutory grounds for rehabilitation); *see also* 18 *Del. C.* § 5910(a) ("An order to rehabilitate a domestic insurer shall direct the Commissioner forthwith to take possession of the property of the insurer and to conduct the business thereof and to take such steps toward removal of the causes and conditions which have made rehabilitation necessary as the court may direct.").

87. Letter from Counsel for Indemnity to the Court of Chancery (Nov. 6, 2013), docket 232.

88. Unanimous Written Consent of the Directors of Indemnity, Exhibit A to Exhibit 2 to Commissioner's Rehabilitation Petition (Nov. 6, 2013), docket 228, ¶ 2 (emphasis added).

89. Motion for Expedited Consideration of the Commissioner's Rehabilitation Petition (Nov. 6, 2013), docket 228, ¶ 6; Unanimous Written Consent of the Directors of Indemnity, Exhibit A to Exhibit 2 to Commissioner's Rehabilitation Petition (Nov. 6, 2013), docket 228, at *3.

90. Phil Milford, *Nightclub Insurer Founder Fights Delaware Regulator Over Seizure*, BLOOMBERG (Oct. 29, 2013 at 3:58 PM), http://www.bloomberg.com/news/2013-10-29/nightclub-insurer-founder-fights-delaware-

"exacerbated the financial and operational difficulties of [Indemnity] and ... increased policyholder concern."[91] The Commissioner and Indemnity's board both said that they were concerned about an imminent "run on the bank" caused by canceled policies and demands for premium refunds, which would have a substantial adverse effect on the interests of policyholders if Indemnity was not placed into receivership as soon as possible.[92]

Later that same day, RB Entertainment sent a letter to the Court of Chancery stating that although it was "well aware of the need for expedited treatment," it was requesting the opportunity to brief a formal motion to intervene before the Court of Chancery entered any rehabilitation order.[93] RB Entertainment's letter quoted the Court of Chancery from the August 22, 2013 hearing transcript:

> If it turns out that the State wants some remedy that would deprive [RB Entertainment] of its voting rights or other[wise] affect its unique rights as a stockholder, I would reconsider and I would give Mr. Cohen, or really [RB Entertainment], the ability to intervene for the purpose of litigating its own particular rights.

RB Entertainment did not indicate which particular right as a stockholder it had been deprived of, did not provide any evidence or assurance of Indemnity's solvency, did not attach a formal motion to intervene that stated the grounds for intervention, and did not include a pleading setting forth the claim or defense for which intervention was being sought, as Court of Chancery Rule 24 required.[94] RB Entertainment said that it would be prepared to submit a formal motion by the following week. Notably, RB Entertainment had not been joined by IDG in its request for intervention, nor did RB Entertainment indicate that RB Entertainment, Cohen, and IDG were willing to assure Indemnity's solvency, by, for example, causing IDG to repay the $20 million it owed to Indemnity. The Commissioner replied by letter that day, urging the Court of Chancery to deny RB Entertainment's request to brief the intervention issue, arguing that it would "slow down the proceedings at the very time when it is critical to determine ... whether [Indemnity] can be rehabilitated, or whether it must be liquidated."[95]

■ The Court of Chancery entered the Rehabilitation and Injunction Order (the "Rehabilitation Order") on November 7, 2013.[96] The Rehabilitation Order appoint-

regulator-over-seizure.html (identifying Indemnity from Cohen's filings in Maryland lawsuits, which were not filed under seal).

91. Motion for Expedited Consideration of the Commissioner's Rehabilitation Petition (Nov. 6, 2013), docket 228, ¶ 9.

92. Motion for Expedited Consideration of the Commissioner's Rehabilitation Petition (Nov. 6, 2013), docket 228, ¶ 10; Unanimous Written Consent of the Directors of Indemnity, Exhibit A to Exhibit 2 to Commissioner's Rehabilitation Petition (Nov. 6, 2013), docket 228, at *3.

93. Letter from Cohen's Counsel to the Court of Chancery (Nov. 6, 2013), docket 235.

94. Court of Chancery Rule 24(c) states that "[a] person desiring to intervene shall serve a motion to intervene upon the parties as provided in Rule 5. The motion shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought. The same procedure shall be followed when a statute gives a right to intervene."

95. Letter from the Commissioner to the Court of Chancery (Nov. 6, 2013), docket 236.

96. The Commissioner argued that the grant of the Rehabilitation Order vacated the Seizure Order as a matter of law, and therefore rendered moot Cohen's appeal of the Amended Seizure Order, the Sanctions Order, and the

ed the Commissioner as the receiver of Indemnity and otherwise granted the Commissioner broad powers that were similar to those contained in the Seizure Order. Although the Rehabilitation Order denied RB Entertainment's request for leave to brief a motion to intervene, the Rehabilitation Order did state that "[t]o the extent [RB Entertainment] has a claim against the [Indemnity] estate, [RB Entertainment] may give notice of its claim and file an objection to any proposed report and recommendation in the manner contemplated by this Rehabilitation and Injunction Order." [97] The Rehabilitation Order gave any person objecting to the final rehabilitation plan submitted by the Commissioner the right to file a written objection within sixty days and indicated that the Court of Chancery would hold a hearing on any objections.[98]

Cohen filed the appeal in Case Number 621, 2013 the next day, on November 8, 2013, challenging (i) the November 1, 2013

---

Rehearing Denial. We disagree. The substance of the dispute has not disappeared and a justiciable controversy still exists, because the same limitations contained in the Seizure Order and Amended Seizure Order were replicated in the Rehabilitation Order almost word for word, and they are still binding upon Cohen.

97. Rehabilitation Order (Nov. 7, 2012), docket 237, ¶ 28.

98. Rehabilitation Order (Nov. 7, 2012), docket 237, ¶¶ 23–25.

99. U.S. CONST. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law...."); DEL. CONST. art. I, § 9 ("All courts shall be open; and every man for an injury done him in his reputation, person, movable or immovable possessions, shall have a remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense.").

---

Additional Sanctions Order and (ii) the entry of the Rehabilitation Order without permitting intervention by RB Entertainment. The two appeals were briefed separately, but consolidated before the parties' argument.

## III. ANALYSIS

### A. Cohen Was Afforded Due Process At All Times

 In his two appeals, Cohen raises a multitude of due process claims.[99] Delaware constitutional due process is coextensive with federal constitutional due process.[100] This Court reviews claims of violations of constitutional rights *de novo*.[101]

 Under both the U.S. and Delaware Constitutions, a person may not be deprived of life, liberty, or property without due process of law. "The fundamental requirement of due process is the oppor-

---

100. *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1259 (Del.2011) (citing *Blinder, Robinson & Co., Inc. v. Bruton*, 552 A.2d 466, 472 (Del.1989)); *see also Helman v. State*, 784 A.2d 1058, 1070 (Del.2001) (quoting *Opinion of the Justices*, 246 A.2d 90, 92 (Del.1968) (noting that the due process clause of the Delaware Constitution has "substantially the same meaning" as the due process clause in its federal counterpart.)); *but see Hammond v. State*, 569 A.2d 81, 85–87 (Del.1990) (citing *Deberry v. State*, 457 A.2d 744 (Del.1983) (holding that, in cases involving the State's obligation to preserve evidence, the due process requirements of the Delaware Constitution require courts to follow the test set forth in *Deberry*, which balances the nature of the State's conduct and the degree of prejudice to the accused, rather than the test adopted by the United States Supreme Court, which only considers whether the State acted in good faith)).

101. *Cooke v. State*, 977 A.2d 803, 840 (Del. 2009).

tunity to be heard 'at a meaningful time and in a meaningful manner.'"[102] But "due process is flexible and calls for such procedural protections as the particular situation demands."[103] As a result, due process does not require an evidentiary hearing approximating a judicial trial before every deprivation of rights; indeed, such extensive process is only required in certain limited circumstances.[104] This Court has explained that "where only property rights are involved, 'mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for ultimate judicial determination of the liability is adequate.'"[105] Thus, "the necessity of prompt action by the State or the impracticality of providing a meaningful pre-deprivation hearing, coupled with the availability of post-deprivation process to assess the legality of the official action, may satisfy the requirements of procedural due process."[106]

■ To determine whether a challenged procedure satisfies due process, Delaware Courts have employed the analysis set out by the United States Supreme Court in *Mathews v. Eldridge.*[107] The "*Eldridge* factors" instruct a Court to balance:

the private interest that will be affected by the official action; the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedures would entail.[108]

### 1. The September 10, 2013 Hearing

■ The only interest that Cohen has identified that was allegedly infringed by the September 10, 2013 hearing and the entry of the Amended Seizure Order is a

---

102. *Mathews v. Eldridge*, 424 U.S. at 333, 96 S.Ct. 893 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)); *Nottingham Partners v. Dana*, 564 A.2d 1089, 1100 (Del.1989).

103. *Slawik v. State*, 480 A.2d 636, 646 (Del. 1984) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Mirzakhalili v. Chagnon*, 2000 WL 1724326 (Del.Ch. Nov. 9, 2000) ("Federal procedural Due Process jurisprudence is not outlined in bright neon lines.")).

104. *Mathews v. Eldridge*, 424 U.S. 319, 333–34, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("[T]his Court increasingly has had occasion to consider the extent to which due process requires an evidentiary hearing prior to the deprivation of some type of property interest even if such a hearing is provided thereafter. In only one case, *Goldberg v. Kelly*, ... has the Court held that a hearing closely approximating a judicial trial is necessary."); *Slawik v. State*, 480 A.2d 636, 645 n. 11 (Del.1984) ("To the extent due process requires some form of pre-termination hearing as a matter of constitutional right, the Supreme Court has

held, on only one occasion, that a hearing approximating a judicial trial is necessary."). *Goldberg v. Kelly* dealt with the termination of welfare benefits. 397 U.S. 254, 266–71, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

105. *Slawik v. State*, 480 A.2d 636, 646 (Del. 1984) (quoting *Phillips v. Comm'r*, 283 U.S. 589, 596–97, 51 S.Ct. 608, 75 L.Ed. 1289 (1931)).

106. *Slawik v. State*, 480 A.2d 636, 646 (Del. 1984) (citing *Parratt v. Taylor*, 451 U.S. 527, 541, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)).

107. 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *see also Watson v. Div. of Family Servs.*, 813 A.2d 1101, 1107 (Del.2002) ("[T]his Court's construction of the Delaware Constitution's mandate for due process 'in accordance with the right of the cause' has been consistent with the flexible standards of due process enunciated by the United States Supreme Court in *Mathews v. Eldridge*.").

108. 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

general property interest arising from the interconnected nature of his many business entities. Paragraph 2 of the Amended Seizure Order enjoined Cohen from communicating with Indemnity's employees or business relationships about Indemnity's business. Cohen claims that this provision "had the effect of shuttering several of [Cohen's] and IDG's businesses: [because] Indemnity has business/contractual relationships with several of [Cohen]'s and [IDG]'s various other business entities."[109] But Cohen himself never articulated his property interest with any degree of specificity. Cohen did not identify any aspect of what the Cohen-affiliated entities did that was separate from Indemnity, describe any specific way that the Cohen-affiliated entities would be harmed if they were denied from communicating with Indemnity, or otherwise explain why the Amended Seizure Order would have a materially negative effect on the Cohen-affiliated entities. This vague and amorphous interest, therefore, did not constitute a property interest that deserved substantial weight.

Cohen's complaints about the office conference held on September 10, 2013 have evolved over the course of the briefing. In his Opening Brief, Cohen argued that he was entitled to an opportunity to present an opposition before the Court of Chancery granted the Amended Seizure Order. In his reply brief and at oral arguments before this Court, however, Cohen focused on the Commissioner's failure to provide him a copy of the transcript from the September 10, 2013 office conference as directed by the Court of Chancery. Cohen claims that if he had read the transcript's reference to potential criminal sanctions, then he would have attended the September 24, 2013 hearing and been available to answer questions. Cohen also alleges that the Commissioner's failure to provide the transcript tainted the September 24, 2013 hearing and every subsequent order for sanctions against him, because although an opportunity to respond had been presented, his decision not to take full advantage of it was based on incomplete knowledge. Essentially, Cohen argues that the failure to provide the transcript deprived him of a meaningful opportunity to respond to the allegations against him and resulted in a deprivation of his property rights without due process.

Despite repeated references to the September 10, 2013 hearing throughout the record,[110] which make it clear that no one intended to keep Cohen unaware that a

---

109. Cohen's Opening Brief (Nov. 25, 2013), No. 545, at *23.

110. *See, e.g.*, Transcript from Oral Arguments (Nov. 1, 2013), docket 419, at 151:4–6 ("On September 10th, 2013, *after a hearing*, I granted the motion and I entered an order amending the seizure order.") (emphasis added); *id.* at A1756 ("I regarded it as indisputably clear that Mr. Cohen was to interact through appropriate legal channels, such as his counsel, and not to continue the types of interference that were the subject of the September 10th hearing."); Additional Sanctions Order (Nov. 1, 2013), docket 217 ("WHEREAS on September 10, 2013, *following a hearing*, this Court granted the Insurer's motion and entered an order amending the Seizure Order ... which imposed additional restrictions on Cohen.") (emphasis added); Memorandum Opinion on Contempt (Jan. 2, 2014), docket 305 ("On September 9, 2013, Indemnity sought an expedited modification of the Seizure Order on the grounds that Cohen was interfering actively with Indemnity and the efforts of the Commissioner. Due to the summary nature of an insurance liquidation and the exigent nature of the motion, *the court heard the motion the following day. Counsel for both Indemnity and the Commissioner participated in the hearing,* and they provided documentary evidence and presented testimony by affidavit. The affiants were present and available to testify, but the court dispensed with live testimony in the interest of time.") (emphasis added).

hearing had been held, Cohen's counsel apparently remained unaware of the fact that the office conference had taken place until January 15, 2013. But Cohen's counsel is correct to note that that it was not his burden to determine whether a hearing—which was unnoticed on the docket—had taken place. In certain circumstances, that sort of omission could possibly rise to a violation of a defendant's due process rights, but those circumstances are not presented here. Although the Commissioner's failure to order and provide the transcript as directed by the Court of Chancery was infelicitous and regrettable, it was not prejudicial to Cohen in any constitutionally meaningful way.

The procedures used by the Court of Chancery in this case created little risk of erroneous deprivation. Cohen received sufficient notice of the substance of the allegations against him. Cohen's counsel was served with Indemnity's motion, proposed order, and supporting exhibits on September 9, 2013, which set out the allegations in detail. Cohen's counsel responded to the motion on September 10, 2013, acknowledging the serious nature of the allegations the motion contained. Cohen's counsel was then served with the Amended Seizure Order on September 10, 2013, which provided Cohen an opportunity to brief the issue and show cause why he was not in contempt, and scheduled a full hearing on the issue for September 24, 2013. Cohen filed his Response to the Amended Seizure Order on September 19, 2013. In its introduction, the Response

explained that the Court of Chancery granted the Amended Seizure Order but then *"afforded Cohen·an opportunity to respond* to the many false and misleading statements and assumptions contained [in the motion]."[111] Cohen's Response contested each of the allegations against him, specifically addressing the allegations that Cohen had monitored Indemnity's email, accessed Indemnity's servers, communicated with Indemnity's employees and insurance brokers, and disclosed the Seizure Order to ratings agency A.M. Best.

Cohen has not identified anything in the short transcript from the September 10, 2013 office conference that he had not otherwise been given notice of. Cohen had full notice of the allegations against him and was afforded a meaningful opportunity to respond within a reasonable amount of time after the Amended Seizure Order was granted.

Moreover, Cohen's argument that the Court of Chancery's mention of criminal sanctions in the transcript would have motivated him to attend the September 24, 2013 hearing is belied by the fact that the proposed order attached to Indemnity's expedited motion on September 9, 2013—which Cohen did receive—suggested *only* criminal sanctions,[112] and that the Amended Seizure Order—which Cohen also received—warned that persons found in violation of the order could be held in *either* civil or criminal contempt.[113] When the Court of Chancery's comments during the September 10, 2013 office conference are placed in proper context, it becomes clear

---

**111.** Cohen's Response to Amended Seizure Order (Sept. 19, 2013), docket 145 (emphasis added).

**112.** Expedited Motion to Amend Seizure Order (Sept. 9, 2013), docket 82, ¶ 3 ("Persons found in violation of this amendment to the Seizure Order shall be held [in] criminal contempt and ... shall be sanctioned as the

Court, in its discretion, shall determine is warranted....").

**113.** Amended Seizure Order (Sept. 10, 2013), docket 85, ¶¶ 4–5 (requiring Cohen to "show cause on or before September 24, 2013, why by accessing Respondent's information and technology systems he is not in contempt of paragraphs 7 and 9 of the Seizure Order").

that the Court of Chancery was not raising the specter of criminal sanctions spontaneously. Rather, it was explaining changes it had made to the proposed order that were actually to Cohen's benefit. The Court of Chancery was trying to protect Cohen's rights while also protecting Indemnity's policyholders and creditors as required by the Insurers Liquidation Act.[114] Therefore, we conclude that Cohen's due process right was not violated in connection with the September 10, 2013 office conference. For the same reasons, we find that the November 1, 2013 Sanctions Order was not tainted by the Commissioner's failure to provide the transcript.[115]

Before the transcript issue emerged as a cri de coeur in Cohen's reply brief, Cohen had argued that he should have been given the opportunity to hold a full trial-type hearing where he could present argument against the Amended Seizure Order before it was entered. That argument is also without merit. The grant of the Amended Seizure Order by the Court of Chancery following an ex parte hearing was authorized by § 5904(a) of the Insurers Liquidation Act, which provides that "the court may *without notice* issue an injunction restraining the insurer, its officers, directors, *stockholders*, ... and all other persons from the transaction of its business or the waste or disposition of its property." It was also authorized by § 5904(b) of the Insurers Liquidation Act, which provides that the Court of Chancery may "*at any time* during a proceeding under this chapter issue such other injunctions or orders as may be deemed necessary to prevent interference with the Commissioner or the proceeding or waste of the assets of the insurer."

Cohen's property interest was protected because the Court of Chancery scheduled an evidentiary hearing shortly after granting the Amended Seizure Order, which gave Cohen a meaningful opportunity to

**114.** Transcript from Office Conference (Sept. 10, 2013), docket 381, at 10:8–11 ("I understand you want the most protection you can [for] the company. But I have to balance that against the idea that Mr. Cohen does continue to have individual rights as well.").

**115.** To the extent that Cohen's due process claim related to the November 1, 2013 Sanctions Order is another way of arguing that the Court of Chancery erred in entering the Sanctions Order against him, we reject that argument. This Court has explained that "[t]o the extent a decision to impose sanctions is factually based, we accept the trial court's factual findings so long as they are sufficiently supported by the record, are the product of an orderly and logical reasoning process, and are not clearly erroneous." *Genger v. TR Investors, Inc.*, 26 A.3d 180, 190 (Del.2011) (citing *Stegemeier v. Magness*, 728 A.2d 557, 561 (Del.1999)). In order to merit sanctions, "[t]he violation must be a failure to obey the court in a meaningful way." *M.B. v. E.B.*, 28 A.3d 495, 500 (Del.Fam.Ct.2011). There was ample evidence in the record of Cohen's repeated violations of the orders, and the Court of Chancery's orders addressed those viola-

tions in a restrained manner. Cohen attended the November 1, 2013 hearing, testified that he knew of and understood the orders, and admitted the facts surrounding his deliberate actions in violation of those orders. Cohen may not now defend against his contempt of those court orders by asserting that they were invalid. *Mayer v. Mayer*, 132 A.2d 617, 621 (Del.1957) (quoted in *Rambo v. Fraczkowski*, 350 A.2d 774, 774 (Del.Super.1975)) ("In a contempt proceeding based upon the violation of an injunction, the only legitimate inquiry to be made by the court is whether or not it had jurisdiction of the parties and of the subject matter. Subject to this limitation the court will not listen to an excuse for the contemptuous action based upon an argument that the order in question was imperfect or erroneous."); *EDIX Media Grp., Inc. v. Mahani*, 2006 WL 3742595 (Del.Ch. Dec. 12, 2006) ("Even an imperfect or erroneous order of this Court must still be followed, and a court may punish disobedience with penalties for contempt so long as the order was not issued in excess of the Court's jurisdiction.").

respond to the Amended Seizure Order and show cause why he was not in civil or criminal contempt of the Seizure Order. That hearing was held on September 24, 2013. Although his attorneys attended on his behalf, Cohen deliberately chose not to personally attend—even though he was facing possible criminal and civil contempt findings and thousands of dollars in potential sanctions that Indemnity had requested in its September 12, 2013 motion, which also was being heard that day. His counsel filed separate oppositions to each motion, and acknowledged that the purpose of the September 24, 2013 hearing was to address both motions.[116] Cohen's counsel had an opportunity to present testimony and documents, as well as cross-examine witnesses.

The additional procedures that Cohen requests would not have appreciably reduced the risk of erroneous deprivation, but they would have impaired the Commissioner's ability to act in the expedited fashion contemplated by the Insurers Liquidation Act, which is necessary to accomplish the policy goals of preventing further damage to a potentially insolvent insurer and protecting remaining assets to pay the claims of its policyholders and creditors.[117] The Insurance Department has a strong countervailing interest in consumer protection and preventing fraud at Indemnity, an interest recognized by the General Assembly when it passed the Insurers Liqui-

dation Act.[118] Thus, after balancing the *Eldridge* factors, we conclude that the Court of Chancery's grant of the September 10, 2013 Amended Seizure Order did not constitute a due process violation in any respect.

## 2. The September 25, 2013 Sanctions Order Extends The Seizure Order To Include IDG

 Cohen also claimed that his due process rights were violated because he was not provided an adequate opportunity to present evidence regarding the corporate separateness of Indemnity and IDG before the September 25, 2013 Sanctions Order was granted. But Cohen did have that opportunity, because it was Cohen who raised that issue in the first place.

Cohen surfaced the issue of corporate separateness in his September 19, 2013 Response to the Amended Seizure Order, when Cohen argued that he should still have access to Indemnity's servers so he could run the seventeen Cohen-affiliated entities. Cohen could have presented evidence about corporate separateness at the September 24, 2013 hearing, but did not. After the hearing, the Court of Chancery concluded that "there's sufficient evidence of a close relationship between Cohen and IDG that at this point I believe it's necessary to preserve the status quo to extend the seizure order and to enjoin Cohen

---

116. Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 3:6–8 ("[W]e stand here prepared to respond substantively to the motions"); *id.* at 27:10–12 ("We are here. We were prepared to come here today to address the two motions that are before the Court."); *id.* at 28:20–21 ("[W]e're here on these two motions.").

117. *Matter of Transit Cas. Co.*, 79 N.Y.2d 13, 580 N.Y.S.2d 140, 588 N.E.2d 38, 41 (1992) ("Statutes providing for the liquidation of insolvent insurance companies are designed to

protect creditors, policyholders and the general public by providing a comprehensive and efficient means for collecting the insolvent's assets and equitably paying the claims of creditors.").

118. *Remco Ins. Co. v. State Ins. Dept.*, 519 A.2d 633, 635 (Del.1986) (noting that the statute grants the Insurance Department "broad regulatory authority to protect policyholders and others who may be harmed by business practices of insurers").

from taking any action to interfere with the company through IDG." [119]

A balancing of the *Eldridge* factors again compels the conclusion that the Court of Chancery did not violate Cohen's right to due process. First, Cohen has never identified any particular interests of IDG's that were harmed by the Sanctions Order. [120] Even later, when he filed a motion for rehearing, [121] the only additional evidence that Cohen was able to present regarding his property interest was that Indemnity's attorneys had withdrawn from representing IDG in certain other matters due to alleged conflicts of interest, and that Indemnity was not depositing checks remitted to IDG and was forwarding them to Cohen instead. [122] Thus, no evidence of record supports a conclusion that Cohen's interests in these entities were seriously impaired by preventing IDG from interfering with the Commissioner's efforts to manage Indemnity. Requiring IDG to hire its own attorneys and to deposit its own checks is not an infringement of IDG's rights; it is simply a requirement that IDG run its own affairs. In this regard, Cohen's own choice to entangle these seventeen entities with a regulated insurer was the major cause of any impairment of his ability to operate them.

Second, even if we assume that Cohen had some, albeit slight and vague, property interest in these entities that was impaired by the Sanctions Order, we find that the procedures used by the Court of Chancery already adequately protect against erroneous deprivation. Cohen had an opportunity to present evidence on corporate separateness at the September 24, 2013 hearing, yet he failed to do so. Despite having injected this issue into the proceedings, Cohen's counsel was not able to provide the Court with any reliable information about what the seventeen Cohen-affiliated entities did, the state of their finances, whether they faced any genuine exigencies, and why. No final determination about veil piercing was made in the September 25, 2013 Sanctions Order, and Cohen still has the opportunity to demonstrate corporate separateness. The Sanctions Order provided for discovery into IDG and the Cohen-affiliated entities, in-

**119.** Transcript from Oral Argument (Sept. 24, 2013), docket 373, at 26:2–6 ("[W]e've got a regulatory proceeding at a stage where, at least so far, no one is showing me any real separation between these businesses.").

**120.** The entirety of Cohen's discussion of the first *Eldridge* factor in his Opening Brief is a conclusory statement that reads as follows: "[IDG] is a company that is owned by [Cohen], not [Indemnity]. Therefore, with respect to the first *Eldridge* factor, the [Court of Chancery]'s decision—which took control out of [IDG]'s hands and placed it in the control of the Commissioner—had a significant impact." Cohen's Opening Brief (Nov. 25, 2013), No. 545, at *29.

**121.** Cohen's Rehearing Motion (Oct. 7, 2013), docket 169.

**122.** Cohen and IDG also argued that the Court of Chancery should not have denied their motion for modification or relief from the Sanctions Order without holding a hearing to consider what they claimed was "new evidence." The standard of review on a motion for re-argument is abuse of discretion. *Poe v. Poe*, 872 A.2d 960 (Del.2005); *Lilly v. State*, 649 A.2d 1055, 1059 (Del.1994). There was uncontradicted evidence in the record that Cohen had interfered with the Commissioner, and that Cohen had used IDG to do so. It was logical for the Court of Chancery to conclude that it was important to preserve the Sanctions Order to prevent Cohen from using IDG to interfere again. Also, the "new" evidence that Cohen asked the Court of Chancery to consider was available to Cohen before the September 24, 2013 hearing and could have been presented there. Thus, we conclude that the Court of Chancery did not abuse its discretion.

cluding "the nature of their business, the identities of their employees, their revenue and its sources, how their corporate structure came to be, and their interrelationship with [Cohen]."[123] Cohen was given an opportunity to challenge the Commissioner's claims and demonstrate corporate separateness, but there is no record evidence that Cohen made any attempt to provide reliable information about what these various entities do, let alone how their ability to function was compromised by having to operate independently of Indemnity.[124]

Thus, additional process would have had no benefit, because Cohen has not even taken advantage of the process that was available to him. Cohen could have prepared a targeted request of the particular documents and information he needed so he could run the various Cohen-affiliated entities independently of Indemnity, if these entities were in fact bona fide, separate business entities. If, however, none of the Cohen-affiliated entities were genuinely distinct businesses that could be disentangled from Indemnity and Cohen simply wished to continue to have full access to Indemnity's affairs, then that reality supports the reasonableness of the Court of Chancery's orders and demonstrates that those orders were necessary to ensure that the Commissioner had sole control over Indemnity. In either event, any intrusion on Cohen's property rights was the self-inflicted result of his having intermingled these other entities' affairs with a regulated entity.

Third, the Insurance Department has a substantial interest in ensuring that the Seizure Order is not circumvented through the use of intermediaries and the abuse of the corporate form. Under the Insurers Liquidation Act, the Commissioner is charged with preventing further damage to an insurer and protecting the remaining assets to pay the potential claims of policyholders and creditors.[125] Cohen was already enjoined from personally interfering with Indemnity, and allowing Cohen to continue to interfere by indulging his continued intermingling of the affairs of non-regulated entities with those of a regulated entity would defeat the purposes of the Insurers Liquidation Act. Any impairment to Cohen's property interests is decisively outweighed by the important public interest in ensuring that the Commissioner could exercise control over Indemnity and protect the interests that were the subject of the Insurers Liquidation Act. Therefore, Cohen's due process rights were not violated by the September 25, 2013 Sanctions Order.

**B. The Court of Chancery's Decision Not To Delay Entry Of The Rehabilitation Order To Allow RB Entertainment Time To Press A Renewed Motion to Intervene Was Appropriate**

 RB Entertainment also claims that its due process rights were violated because the Court of Chancery did not

---

123. Sanctions Order (Sept. 25, 2013), docket 161, ¶ 2.

124. Cohen claims that certain IDG bills have not been paid and that it is having an effect on IDG's credit worthiness. *See* Cohen's Opening Brief (Nov. 25, 2013), No. 545, at *31. Cohen claims that he has been unable to provide the evidence necessary to support his claims of corporate separateness because all the documents are located inside Indemnity's

offices and he has been unable to get discovery from Indemnity. *See* Cohen's Opening Brief (Nov. 25, 2013), No. 545, at *30 n. 17 and accompanying text.

125. *Kentucky Cent. Life Ins. Co. v. Stephens*, 897 S.W.2d 583 (Ky.1995) (noting that the purpose of the Uniform Insurers Liquidation Act is "the protection of the interest of the insured, creditors, and the public generally").

permit it to brief the issue of intervention before it entered the Rehabilitation Order. In responding to RB Entertainment's claim, the Commissioner raised the interesting question of whether the Insurers Liquidation Act gives a stockholder, like RB Entertainment, standing to intervene and oppose a Rehabilitation Order. Delaware has not yet determined the standing of a stockholder to oppose a delinquency petition, but cases from other jurisdictions provide persuasive guidance about how to interpret the Insurers Liquidation Act.[126] Jurisdictions that have considered the issue have typically held that stockholders do not have standing to intervene in a delinquency proceeding.[127] RB Entertainment has not cited any case where standing to intervene was granted to a stockholder under the Insurers Liquidation Act in Delaware or in a comparable proceeding in any other jurisdiction. Furthermore, the Commissioner argues that denying stockholders standing to intervene supports the goals of the Insurers Liquidation Act, which center on the orderly, expeditious, and equitable resolution of all claims against the insolvent insurer.[128] Permitting general intervention would complicate and slow that process.[129] We need not address or answer this question here, however, because it is not essential to the resolution of this appeal. RB Entertainment does not appeal from a definitive ruling denying it standing to intervene. Instead, it challenges the Court of Chancery's decision to deny RB Entertainment's request, submitted by letter after the Rehabilitation Petition had been submitted, for leave to brief a motion to intervene before entry of the Rehabilitation Order.

RB Entertainment argues that this denial violated its right to due process. To determine whether RB Entertainment's due process rights were violated, we again balance the *Eldridge* factors, and conclude that the Court of Chancery did not violate RB Entertainment's right to due process. RB Entertainment argues that it should have been allowed to brief a motion to

126. 18 *Del. C.* § 5920 ("The [Insurers Liquidation Act] shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states that enact it.").

127. *See supra* note 33 (citing cases where stockholders did not have standing to intervene in delinquency proceedings); *State ex rel. Holland v. Heritage Nat. Ins. Co.*, 184 P.3d 1093, 1097 (Okla.Civ.App.2008) ("Shareholders do not have standing to intervene in a receivership proceeding"); *State ex rel. Crawford v. Am. Standard Life & Acc. Ins. Co.*, 37 P.3d 971, 974 (Okla.Civ.App.2001) (holding that stockholders do not have standing to intervene); *see also Ainsworth v. Old Sec. Life Ins. Co.*, 685 S.W.2d 583, 586 (Mo. App.1985) (holding that sole shareholder was not permitted to intervene in a delinquency proceeding because allowing it "would too much encumber the receivership proceeding"); STEVEN PLITT, DANIEL MALDONADO, JOSHUA D. ROGERS & JORDAN R. PLITT, COUCH ON INSURANCE § 5:36 (3d ed. 2013) ("Stockholders of insurer placed in receivership pursuant to the Uniform Insurers Liquidation Act do not have standing to intervene in a receivership proceeding.").

128. STEVEN PLITT, DANIEL MALDONADO, JOSHUA D. ROGERS & JORDAN R. PLITT, COUCH ON INSURANCE § 5:36 (3d ed. 2013) ("One of the purposes of the [Insurers Liquidation Act] is to provide for a uniform, orderly and equitable method of making and processing claims against financially troubled insurers and to provide for fair procedures for distributing their assets.").

129. Transcript from Office Conference (Aug. 22, 2013), at A284 (Counsel for Indemnity arguing that "I think ... you create a precedent where you let one shareholder intervene in a delinquency proceeding like this, you really do open the floodgates in future delinquency proceedings for multiple shareholders, policyholders, creditors, all claims with an interest in the litigation" and noting that "bringing in another party is obviously going slow ... the train down even more.").

intervene before the entry of the Rehabilitation Order to protect an ill-defined and cursorily-pled property interest. Whatever property interest RB Entertainment may have had, it stemmed from its disputed claim to be a stockholder of Indemnity. But even if RB Entertainment is a stockholder, that does not give it a claim over any specific asset of Indemnity.[130] And, if Indemnity is insolvent, RB Entertainment may have no right to a liquidation payment at all given the priority of claims set out in the Insurers Liquidation Act.[131] Moreover, Indemnity's board—which was representing the interests of equityholders and debtholders—had unanimously consented to the entry of the Rehabilitation Order, because it believed that rehabilitation would maximize the value of the company and might allow it to avoid liquidation.[132] In such cases, hearings are unnecessary.[133]

With brazenness, RB Entertainment also argues that intervention is "particularly appropriate ... where the principal of the equity holder is accused of fraud but not permitted an opportunity to challenge those allegations."[134] If RB Entertainment or Cohen had truly never been given an opportunity to challenge the fraud allegations, then that argument might have been advanced without a lack of grace. But, as the record reflects, the Court of Chancery asked whether RB Entertainment wanted to contest the fraud issue at the hearing on August 22, 2013 on RB Entertainment's original motion to intervene.[135] At no time in the months that followed did RB Entertainment do so. RB

---

130. *Norte & Co. v. Manor Healthcare Corp.*, 1985 WL 44684 (Del.Ch. Nov. 21, 1985) (citing *Bird v. Wilmington Soc. of Fine Arts*, 43 A.2d 476, 483 (Del.1945) ("[T]he corporation is the legal owner of its property and the stockholders do not have any specific interest in the assets of the corporation.")); *see also* 1 FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 31, *Distinctness of corporate entity* (2013) ("The property of the corporation is its property and not that of the shareholders as owners, even if there is only one Shareholder....").

131. 18 *Del. C.* § 5918(e)(9) (placing "[t]he claims of shareholders or other owners arising out of such capacity" as last in priority); *see also Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772 (Del.Ch.2004); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613 (Del.Ch. Dec. 30, 1991).

132. Cohen's Reply Brief raises for the first time the idea that he may have wished to remove Indemnity's board by exercising a written consent. *See* Cohen's Reply Brief (Feb. 14, 2014), No. 621, at 17. This belated argument is unfairly raised and has no grounding in the record below. Cohen voluntarily resigned from Indemnity's board on August 5, 2013, and left its governance to the remaining directors. Although it may have

violated the orders of the Court of Chancery for Cohen to unilaterally remove and replace the board of Indemnity after that time, nothing prevented Cohen from making an application for relief to the Court of Chancery in order to do so. Of course, to have done so would require a judicial determination that Cohen's claim he indirectly owns 99 percent of Indemnity's equity through RB Entertainment was factually accurate. Indemnity's board claims that there is no record that Indemnity ever issued stock to RB Entertainment or anyone else in exchange for genuine economic consideration. *See supra* note 32. For present purposes, what is clear is that the right to manage the affairs of Indemnity was vested in its board of directors at all times, to the extent that Indemnity was not otherwise under the control of the Commissioner.

133. *See, e.g., In re Rehab. Of Nat'l Heritage Life Ins. Co.*, 656 A.2d 252, 254 (Del.Ch.1994) (entering a rehabilitation order on the day after the petition was filed with the consent of the board and without notification of any third party).

134. Cohen's Opening Brief (Dec. 23, 2013), No. 621, at *27.

135. Transcript from Office Conference (Aug. 22, 2013), docket 73, at 33:10–14.

Entertainment's proposed pleading, filed on August 21, 2013 in opposition to the Liquidation Petition, failed to respond to the allegations of fraud in the Commissioner's petition, stating that it should be addressed "separately." [136] For his part, Cohen has not denied the fraud either.[137] As a result, the record before the Court of Chancery consisted solely of strong evidence of fraud material to Indemnity's solvency—evidence that those in the strongest position to refute chose not to dispute.

Nonetheless, in its letter on November 6, 2013, RB Entertainment asked the Court of Chancery to delay entering the Rehabilitation Order, despite a record of (i) uncontested evidence of substantial financial fraud by Cohen that was material to Indemnity's solvency, (ii) a balance sheet that included as a major asset a $20 million receivable from IDG, an entity owned by Cohen that was apparently insolvent itself and whose nature Cohen never clarified, even though he had been given multiple chances to do so, (iii) public disclosure of Indemnity's financial problems and the fraud allegations because of Cohen's own actions, and (iv) the unanimous view of Indemnity's board, which had earlier argued that Indemnity was solvent, that Indemnity's financial problems were worse than it realized and that the expeditious entry of the Rehabilitation Order was nec-

essary in order to make a last attempt to secure a transaction that would enable Indemnity to avoid liquidation.

In the face of this compelling interest, RB Entertainment, through its letter, sought leave to have briefed and decided yet another motion to intervene before entry of a rehabilitation order. RB Entertainment's letter did not indicate that it would contest the evidence of fraud, that it had any evidence that Indemnity was not in the precarious financial situation that the Commissioner's and Indemnity's board's submissions and evidence indicated, or that it or any of the other Cohen-affiliated entities would offer to provide financial assurance to Indemnity to soothe the concerns about its perilous circumstances. And notably, RB Entertainment did not indicate that its fellow Cohen-controlled affiliate IDG was prepared to deliver the $20 million it owed to Indemnity.

The Court of Chancery denied RB Entertainment's eleventh-hour request and entered the Rehabilitation Order on November 7, 2013. In addition to the many opportunities to protect its interests that the Court of Chancery gave RB Entertainment before entering the Rehabilitation Order, the plain terms of the Rehabilitation Order and the Insurers Liquidation

---

**136.** RB Entertainment's Opposition to Petition to Liquidate (Aug. 21, 2013), docket 65, at *3 ("Indemnity's former President, Mr. Cohen, has resigned as an officer and director of indemnity, as has Indemnity's former Controller, Mrs. Piotrowski. The alleged wrongdoing of these two former employees should be addressed separately, because neither is in a position to cause any further harm.").

**137.** Cohen's Affidavit, Exhibit A to RB Entertainment's Opposition to Petition to Liquidate (Aug. 21, 2013), docket 65 (arguing that Indemnity was solvent and noting that he had resigned from Indemnity's board, but not denying the fraud allegations against him); Cohen's Affidavit, Exhibit D to Cohen's Re-

sponse to Amended Seizure Order (Sept. 19, 2013), docket 145 (claiming that the servers were owned by IDG and contesting allegations that he had interfered with the Commissioner, but not denying the fraud allegations); Exhibit G to Verified Petition (Oct. 18, 2013), docket 181 (denying that he had interfered with the Commissioner, but not denying the fraud allegations); Cohen's Affidavit, Exhibit A to Letter to Court of Chancery (Nov. 15, 2013), docket 258 (apologizing for his behavior when returning the vehicles and explaining that he was upset about watching Indemnity's business unravel, but not denying the fraud allegations).

Act provided further protection to RB Entertainment and other interested parties from erroneous deprivation. RB Entertainment was given the opportunity to be heard later on any specific issues that implicate its property rights, by submitting an objection to specific provisions of the Commissioner's proposed Rehabilitation Plan.[138] These procedures adequately protected any risk to RB Entertainment's purported property rights.

Most importantly, there were strong public policy reasons justifying the Court of Chancery's refusal to delay the entry of the Rehabilitation Order while intervention was briefed. Cohen's own actions and violations of the Court of Chancery's orders had created a situation of urgency. Indemnity's identity had become public knowledge because of Cohen's filing of the Maryland Lawsuits, and as policyholder concern over the undisputed allegations of fraud grew, Indemnity's board feared a "run on the bank" that would further deplete Indemnity's assets. The record evidence was overwhelming that Indemnity's financial condition was precarious, and its own board had come to the belated realization that Indemnity was insolvent. There

was also legitimate concern that delay would cause the potentially life-saving transaction with AmTrust to fall apart, forcing Indemnity into liquidation instead of rehabilitation. The Commissioner had an important interest in moving quickly to protect the interests of policyholders and creditors.[139] We find that on balance, the Commissioner's interest in speed far outweighed RB Entertainment's interest in further delaying the proceedings, and the Court of Chancery did not violate any due process right by denying RB Entertainment an opportunity to brief the intervention issue before entering the Rehabilitation Order.

## IV. CONCLUSION

For all of the reasons above, the judgments of the Court of Chancery are AFFIRMED.

---

138. 18 *Del. C.* § 5917; *see also* Rehabilitation Order (Nov. 7, 2012), docket 237, ¶¶ 23–25. Courts have shown that they will entertain those types of specific objections and challenges to a proposed Rehabilitation Plan. *See, e.g., In re Rehab. of Manhattan Re–Ins. Co.,* 2011 WL 4553582 (Del.Ch. Oct. 4, 2011); *see also In re Ambac Assur. Corp.,* 351 Wis.2d 539, 841 N.W.2d 482 (Wis.App.2013) (denying motion to intervene and holding that op-

portunity to object to specific aspects of the rehabilitation plan satisfied due process).

139. *Remco Ins. Co. v. State Ins. Dept.,* 519 A.2d 633, 636 (Del.1986) (noting that "[a]s the title of the Act indicates, the purpose of the summary remedies is to permit the Commissioner to act quickly when need be to prevent harm to policyholders.").