# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN THE MATTER OF THE )
LIQUIDATION OF ) C.A. No. 8601-VCZ
INDEMNITY INSURANCE )
CORPORATION, RRG )

## MEMORANDUM OPINION

Date Submitted: February 25, 2019
Date Decided: May 15, 2019

Christopher P. Simon and Kevin S. Mann, CROSS & SIMON, LLC, Wilmington, Delaware; James J. Black III, Jeffrey B. Miceli, Mark W. Drasnin, BLACK & GERNGROSS, P.C., Philadelphia, Pennsylvania; *Attorneys for the Honorable Trinidad Navarro, Insurance Commissioner of the State of Delaware, as Receiver for Indemnity Insurance Company, RRG, in Liquidation*

David S. Eagle and Sally E. Veghte, KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; Francis M. Correll, KLEHR HARRISON HARVEY BRANZBURG LLP, Philadelphia, Pennsylvania; *Attorneys for Intervening Third-Party Plaintiff Branch Banking & Trust Company*

**ZURN, Vice Chancellor**

Indemnity Insurance Corporation, RRG ("IIC") is undergoing delinquency proceedings after years of internal fraud. Delaware's Insurance Commissioner administers IIC's liquidation as its Receiver. Prior to these proceedings, IIC and its controller entered into a $5 million loan with a bank and then allegedly defaulted on their obligations. That bank's successor in interest, Branch Banking and Trust Company ("BB&T"), brought this third-party action seeking a declaratory judgment that it has a valid and enforceable security interest to the proceeds of that loan. The Receiver raised affirmative defenses asserting that BB&T's predecessor committed acts tantamount to fraud, and that BB&T's purported security interest is thus unenforceable as a matter of equity. The Receiver also asserts that IIC's guaranty of the loan and BB&T's security interest are void for failure to disclose those agreements to, and secure the approval of, the Commissioner.

BB&T moved for summary judgment to exclude the Receiver's affirmative defenses.[1] I grant that motion in part. BB&T has brought a purely legal claim: a declaratory judgment as to rights under a series of contracts. The Receiver's equitable defenses are unavailable to bar that legal relief. In addition, I conclude that the Receiver's requested relief of declaring some of the relevant agreements

---

[1] Docket Item ("D.I.") 656 [hereinafter the "Motion"]. I refer to briefing on the Motion as the Opening Brief, the Opposition Brief, and the Reply Brief. *See* D.I. 655, 665, 681. I refer to the transcript of the February 25, 2019 hearing on the Motion as the Hearing Transcript.

void is a statutory remedy that the Commissioner must exercise in the first instance, not this Court. The Commissioner, here synonymous with the Receiver, has not requested appropriate relief under that statutory scheme, rendering the relevant agreements, at most, voidable by the Commissioner. Summary judgment is granted against any affirmative defenses that rely on the theories I reject in this opinion.

## I.    BACKGROUND

Delaware courts have already described the long and tumultuous history of these proceedings.[2] This opinion only addresses facts essential to the Motion, drawn from the record to date.

BB&T brought its third-party complaint as successor to Susquehanna Bank.[3] Throughout 2012, Susquehanna entered into a series of transactions with IIC; its controller, Jeffrey Cohen; and other entities controlled by Cohen and related to IIC. One of those transactions was a $3 million revolving line of credit (the "LOC").[4] After the parties entered into the LOC, Cohen attempted to change its structure to place him as borrower and IIC as guarantor. In email correspondence with

---

[2] *See, e.g.*, *Cohen v. State ex rel. Stewart*, 89 A.3d 65 (Del. 2014); *Indem. Ins. Corp., RRG v. Cohen*, C.A. No. 8985-VCZ (Del. Ch. Apr. 22, 2019) (ORDER); *Matter of Liquidation of Indem. Ins. Corp., RRG*, 2018 WL 6431747 (Del. Ch. Dec. 6, 2018).

[3] *See* D.I. 512 ¶ 3.

[4] BB&T alleges that Susquehanna relied on a record of IIC's annual audited financial statements, an independent valuation provided by Cohen, and Cohen's personal financials before entering into the LOC. *Id.* at 5-6.

2

Susquehanna, Cohen acknowledged that the point of his ask was to "add capital without a corresponding liability" to help IIC capture a larger number of "very profitable accounts that we can write with increased rate levels."[5] A Susquehanna representative hesitated, remarking to Cohen that his plan "really comes across the wrong way in my opinion," and that Susquehanna's "preliminary thoughts are that we would prefer not to do this" without regulatory sign-off.[6] Susquehanna held fast on its position when Cohen suggested the idea a second time in September 2012.[7]

By October 2012, Cohen and Susquehanna were discussing a $5 million term loan (the "Loan") to either Cohen or RBE Entertainment ("RBE"), an entity that controlled IIC and was, in turn, controlled by Cohen. The Loan's purpose, at least as framed by Cohen and according to BB&T, was to help IIC prepare for an initial public offering by increasing its ability to write premiums.[8] Cohen's pitch was that the Loan, payable on demand, would be made to RBE to provide a capital injection to IIC. IIC would guarantee the Loan. But Susquehanna would hold the cash in a restricted account in IIC's name.

---

[5] Answering Br. Ex. 36.

[6] *Id.*

[7] Answering Br. Ex. 68.

[8] Opening Br. 7.

To support the Loan, Cohen and IIC gave Susquehanna a series of audited financial statements, but Susquehanna also requested an opinion letter from counsel to Cohen, RBE, and IIC, addressing the Loan's propriety. The borrowing parties agreed and furnished an opinion letter stating, among other things:

> [N]o consent, approval, authorization, or other action by, or filing with, any governmental authority is required for the execution and delivery by the Company of the [Loan] Documents or, if required, the requisite consent, approval, or authorization has been obtained, the requisite filing has been accomplished, or the requisite action has been taken.[9]

On December 12, 2012, Susquehanna, RBE, Cohen, IIC, and another Cohen entity closed on the Loan transaction.[10] The Loan was payable on demand, and guaranteed by IIC as well as by Cohen and one of his entities.[11] Although RBE was technically the borrower, the funds were for IIC's benefit. Susquehanna held the proceeds in a collateral account in IIC's name, and IIC granted Susquehanna a security interest in those proceeds.[12] The agreement establishing that security interest between Susquehanna and IIC agreed that all funds held in the Loan

---

[9] Answering Br. Ex. 37.

[10] Opening Br. Ex. 4 [hereinafter "Loan Agreement"].

[11] Opening Br. Exs. 5-7.

[12] Opening Br. Ex. 8.

4

collateral account "shall be under the sole dominion and control of" Susquehanna.[13] In short, the funds were not available to IIC to fulfill policyholders' claims.

In May 2013, the Commissioner initiated this action by petitioning for a seizure order under the Delaware Uniform Insurance Liquidation Act ("DUILA").[14] Those proceedings progressed to a petition for the entry of a liquidation order in July 2013, followed by a failed attempt at rehabilitating IIC in November 2013.[15] Ultimately, in April 2014, the Court entered a Liquidation and Injunction Order with Bar Date (the "Liquidation Order"), placing IIC into liquidation.[16]

Under the Liquidation Order, the Commissioner, as Receiver, is tasked with overseeing the administration of claims by IIC's creditors and policyholders. "The object to be attained by the liquidation of an insolvent insurance company is the orderly and equitable apportionment among creditors of losses that may result and to ensure the equitable distribution of an insolvent debtor's property or assets among creditors."[17] The Liquidation Order permits the Receiver to "take and continue exclusive possession of the property of [IIC],"[18] and also provides that:

---

[13] Opening Br. Ex. 8.

[14] 18 *Del. C.* §§ 5901, *et seq.*

[15] D.I. 20, 228, 237.

[16] D.I. 444.

[17] 44 C.J.S. Insurance § 245.

[18] Liquidation Order ¶ 3.

All persons or entities . . . that have in their possession Assets or possible Assets and/or have notice of these proceedings or of this Order are hereby enjoined, restrained and prohibited from . . . transferring, destroying, wasting, encumbering or disposing of any property, assets, books or records of [IIC] whether such assets, property, books or records are or may be the property of [IIC], without the prior written permission of the Receiver or until further Order of this Court.[19]

On May 27, 2016, Susquehanna's successor BB&T filed its third-party complaint ("the Complaint") to prevent the Loan funds from being marshalled into IIC's Assets under the Liquidation Order.[20] BB&T purports that the Loans are in default due to "nonpayment by RBE of principal and interest due, and the commencement of delinquency proceedings against" IIC.[21] Additionally, as of the Complaint's date, the amount due under the Loan was $5,314,538.24, against a balance in the Loan's collateral account of only $5,060,601.09.[22] That gap has, presumably, widened since then.

BB&T seeks a declaratory judgment that the Loan funds are not an Asset or possible Asset of IIC under the Liquidation Order, that BB&T has a first priority lien against and security interest in those funds, that it can set-off amounts due under the Loan against funds held in the Loan's collateral account, and that any deficiency

---

[19] *Id.* at ¶ 8.

[20] D.I. 512.

[21] Compl. ¶¶ 21-22.

[22] *Id.*

6

after that set-off will be an unsecured claim against IIC's general assets.[23]  BB&T also seeks relief from the Liquidation Order in these proceedings, or, alternatively, a decree that the Liquidation Order is unconstitutionally vague.[24]  The Receiver answered BB&T's pleadings with narrative denials and several affirmative defenses, many of which assert that the Loan and its corollary agreements are invalid and unenforceable due to, essentially, fraud by Susquehanna.[25]

On November 21, 2018, BB&T filed the Motion.  On November 26, it amended the Motion, but kept the same opening brief.[26]  The parties completed briefing, and on February 25, 2019, I heard argument at the Hearing.

## II.    ANALYSIS

"The function of summary judgment is the avoidance of a useless trial where there is no genuine issue as to any material fact."[27]  Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter

---

[23] Compl. 15.

[24] *Id.*

[25] D.I. 519 [hereinafter "Answer"].

[26] The amendment appears to have corrected a scrivener's error in the text of the cover motion.  *See* D.I. 656.

[27] *Emmert v. Prade*, 711 A.2d 1217, 1219 (Del. Ch. 1997).

7

of law."[28]  "A fact is material if it 'might affect the outcome of the suit under the governing law.'"[29]  A material issue of fact exists if "a rational trier of fact could find any material fact that would favor the non-moving party in a determinative way, drawing all inferences in favor of the nonmoving party."[30]

The parties' dispute essentially boils down to whether BB&T can enforce its first priority lien in this action, which reduces further to whether the Loan funds are IIC's Assets or possible Assets that must be turned over to the Receiver as part of the claims administration process under the Liquidation Order and DUILA. Answering this question begins with Delaware's claims administration structure for a liquidation.  That structure gives secured creditors the ability to remove their claim from the general pool of assets under the Receiver's control for purposes of liquidation.  DUILA Section 5918 sets out the priority of claims for delinquency proceedings.  Section 5918(e) describes the waterfall for all payments "from the insurer's general assets" under the Receiver's control per the Liquidation Order. Policyholders, beneficiaries, and insureds are paid in Class III, while general creditors are not paid until Class VI.  "Under this priority scheme, general creditors

---

[28] Ct. Ch. R. 56(c).

[29] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *3 (Del. Ch. Dec. 29, 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[30] *Id.*

8

are unlikely to recover from an insolvent insurer."[31] Section 5918(d), however, provides that "[t]he owner of a secured claim . . . may surrender his or her security and file a claim as a general creditor, or the claim may be discharged by resort to the security, in which case the deficiency, if any, shall be treated as a claim against the general assets of the insurer on the same basis as claims of unsecured creditors." In other words, Section 5918 permits security holders either to execute on their security and channel that portion away from the waterfall process, or to pursue the entire interest as a general creditor claim from the insurer's general assets.[32]

"Although the Rehabilitation Order and the Liquidation Order vested title to [IIC's] property in the Commissioner, those orders only gave the Commissioner the same rights that [IIC] possessed."[33] The Receiver stepped into IIC's shoes for purposes of determining who has claim over the Loan funds, and thus "did not gain greater rights than [IIC] had."[34] If BB&T is correct that it holds a secured claim against the defaulted Loan funds, then the Receiver does not have any greater claim

---

[31] *In Matter of Liquidation of Freestone Ins. Co.* (*Freestone II*), 143 A.3d 1234, 1248 (Del. Ch. 2016).

[32] *See Freestone II*, 143 A.3d at 1247 n.10 ("The owner of a secured claim is given a choice. The owner may either (i) 'surrender his or her security and file a claim as a general creditor' or (ii) 'the claim may be discharged by resort to the security, in which case the deficiency, if any, shall be treated as a claim against the general assets of the insurer on the same basis as claims of unsecured creditors.'").

[33] *In Matter of Liquidation of Freestone Ins. Co.* (*Freestone I*), 2014 WL 7399502, at *4 (Del. Ch. Dec. 24, 2014).

[34] *Freestone I*, 2014 WL 7399502, at *4.

to those funds than IIC would have had. Thus, in order to determine whether the Loan funds are Assets or possible Assets of IIC's estate, such that they must be turned over through the Liquidation Order and added to IIC's general assets under Section 5918, the Court must first determine whether BB&T holds a valid and enforceable security interest. If it does, BB&T can execute on that security interest to recover the secured amount from the Loan collateral account, and then submit any deficiency claim for additional amounts owed as a general creditor.[35]

The Receiver does not dispute at this time that the Loan Agreement and its corollary materials create an enforceable security interest in the Loan funds.[36] Instead, the Receiver asserts a series of equitable affirmative defenses to preclude the validity or enforceability of BB&T's security interest. As developed in briefing,

---

[35] BB&T's counsel stated at the Hearing that BB&T has not yet resorted to the security interest, but rather chose to pursue this declaratory judgment to settle the rights. Hearing Tr. at 17. Because no party has raised whether that choice bars them from enforcing a security interest under Section 5918(d), I do not reach that question.

[36] I refer here to the parties' positions on BB&T's Motion. The Receiver may, of course, dispute the technical validity of the Loan Agreement and its corollary agreements at trial.

those theories largely fall into three doctrines: unclean hands,[37] quasi-estoppel,[38] and equitable subordination.[39] The Receiver also argues that the Loan and BB&T's security interest are generally unenforceable because the Commissioner did not approve their terms under the applicable regulatory provisions.[40]

One of the Receiver's defenses fails on procedural grounds. The Receiver never pled equitable subordination as an affirmative defense or counterclaim. Nor did the Receiver raise the argument, even informally, prior to the Answering Brief. Although the parties dispute whether equitable subordination is a defense or a remedy, I need not reach that question where, as here, the Receiver failed to plead it as either. I GRANT summary judgment against the Receiver's equitable subordination claim.

---

[37] *See generally* Answer 29-31. Although many of the Receiver's affirmative defense allegations look like fraud allegations, the Receiver is adamant that it "has not asserted a counterclaim for fraud," and that, instead, the allegations of fraud "are relevant to show inequitable conduct . . . in the context of a defense of unclean hands or related defenses[.]" Answering Br. 52-53. "Fraud can constitute 'offensive conduct' sufficient to invoke the unclean hands doctrine." *Universal Enter. Grp., L.P. v. Duncan Petroleum Corp.*, 2014 WL 1760023, at *7 (Del. Ch. Apr. 29, 2014).

[38] *See* Answer 29; Answering Br. 64.

[39] *See* Answering Br. 67.

[40] *See* Answer 30.

**A.      The Receiver Cannot Assert Its Equitable Defenses Against BB&T's Declaratory Judgment Seeking Legal Relief.**

Unclean hands and quasi-estoppel are equitable defenses. "The doctrine of unclean hands provides that he who comes into equity must come with clean hands; in other words, equitable relief will be denied to a party who has engaged in inequitable conduct related to the matter in which he is seeking such relief."[41] "Under Delaware law, the doctrine of quasi-estoppel applies 'when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.'"[42]

"'The Court of Chancery jealously guards its domain as a court of equity,' and accordingly, 'the Court will refuse equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals.'"[43] "Typically, a party may not assert an equitable defense against a purely legal claim,

---

[41] *NHB Advisors, Inc. v. Monroe Capital LLC*, 2013 WL 6906234, at *2 (Del. Ch. Dec. 27, 2013).

[42] *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 872-73 (Del. 2015) (quoting *Bank of New York Mellon v. Commerzbank Capital Funding Tr. II*, 2011 WL 3360024, at *8 n.71 (Del. Ch. Aug. 4, 2011)); *see also Farkas v. Jarrell*, 1993 WL 401878, at *2 (Del. Ch. Sept. 17, 1993) ("The term quasi-estoppel generally is included within the synonymous doctrines of equitable estoppel and estoppel *in pais*."); 31 C.J.S. Estoppel and Waiver § 146 ("Quasi-estoppel is an equitable concept based on principles of conscionability.").

[43] *NHB Advisors*, 2013 WL 6906234, at *2 (quoting *Wagamon v. Dolan*, 2013 WL 1023884, at *2 n.19 (Del. Ch. Mar. 15, 2013)).

even when the legal claim is pending in a court of equity."[44]  Similarly, "the vindication of purely statutory rights represents an exercise of the prerogative of the legislature, and not this equity Court," and "a purely statutory right, therefore, will be enforced by this Court not as a matter of equity, but of law, even where . . . the claimant has acted inequitably in a collateral matter."[45]

Here, BB&T is asserting a purely legal claim:  declaratory judgment as to its rights under the Loan documents, in the context of IIC's statutory liquidation. BB&T asks this Court to examine the Loan documents and conclude that "[t]he Collateral Account has been pledged and deposited for the exclusive benefit of [BB&T] and, therefore, does not constitute a general asset of [IIC]."[46]  I find that the Receiver's unclean hands and quasi-estoppel theories are "unavailable because [BB&T's] claims do not invoke equity and are not, therefore, subject to equitable

---

[44] *NASDI Hldgs., LLC v. N. Am. Leasing, Inc.*, 2019 WL 1515153, at *6-7 (Del. Ch. Apr. 8, 2019) (granting summary judgment against unclean hands defense for breach of contract claim); *see also Kraft v. WisdomTree Investments, Inc.*, 145 A.3d 969, 976 (Del. Ch. 2016) ("[A] plaintiff vindicating a purely legal action in the Court of Chancery as a result of ancillary jurisdiction or some other jurisdictional source should not be placed in a potentially better position to seek to avoid a statute of limitations than if she had filed in a Delaware court of law[.]").

[45] *In re Estate of Tinley*, 2007 WL 2304831, at *1 (Del. Ch. July 19, 2007).

[46] Compl. ¶ 46.

defenses."[47]   Accordingly, I GRANT summary judgment against the affirmative defenses relying on unclean hands and quasi-estoppel.[48]

**B.      The Commissioner Has Not Properly Voided The Loan Guarantees And Security Interest For Failure To Disclose To The Commissioner.**

BB&T also moved for summary judgment on the Receiver's sixth and seventh affirmative defenses, which claim that the guaranty agreement, and BB&T's security interest provided therein, are invalid and unenforceable because the guaranty was made without the Commissioner's approval.

---

[47] *Quantlab Grp. GP, LLC v. Eames*, 2019 WL 1285037, at *7 (Del. Ch. Mar. 19, 2019); *see also Weber v. Weber*, 2015 WL 1811228, at *4 n.20 (Del. Ch. Apr. 20, 2015) ("Generally, this Court does not apply the unclean hands doctrine in garden-variety breach of contract cases."); *Universal Enter. Grp.*, 2014 WL 1760023, at *8 (Del. Ch. Apr. 29, 2014) ("Delaware courts are hesitant to apply unclean hands in cases involving a breach of contract."); *Lehman Bros. Hldgs. Inc. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at *7 n.47 (Del. Ch. Feb. 25, 2014), *aff'd*, 105 A.3d 989 (Del. 2014) ("Similarly, the 'unclean hands' doctrine bars equitable, but not legal, relief.").

[48] Additionally, the parties brief a dispute, borne from discovery, regarding whether Susquehanna accurately disclosed the nature of the Loan and its security interest in an auditor's confirmation process leading up to IIC's planned IPO. The Receiver claims that an inaccurate disclosure from Susquehanna can be "evidence of [Susquehanna's] inequitable conduct in three ways": (1) evidence of fraud, (2) evidence in support of quasi-estoppel, or (3) evidence that Susquehanna knew or, or aided and abetted, Cohen's fraud. Answering Br. 75. At this juncture, that allegedly deficient disclosure appears relevant only to an unclean hands or estoppel defense, both of which I have rejected. The Receiver has provided no independent grounds or standing, outside of those equitable defenses, to contest BB&T's security interest based on the auditor's confirmation process. As a result, I do not reach this theory here.

At the time of the Loan transaction in 2012, 18 *Del. C.* § 5005(a)(2)(a), in the Insurance Holding Company System Registration Act ("the Registration Act"), provided in relevant part:

> The following transactions involving a domestic insurer and any person in its holding company system may not be entered into unless the insurer has notified the Commissioner in writing of its intention to enter into such transaction at least thirty days prior thereto . . . and the Commissioner has not disapproved it within such period: (a) Sales, purchases, exchanges, loans or extensions of credit, guarantees, or investments, provided such transactions are equal to or exceed . . . the lesser of three percent of the insurer's admitted assets or twenty-five percent of surplus as regards policyholders.[49]

BB&T claims Section 5010(c) of the Registration Act provides that the exclusive remedy for noncompliance with Section 5005, a sort of statutory rescission, and vests that remedy in the Commissioner. Section 5010(c) reads:

> Whenever it appears to the Commissioner that any insurer subject to this chapter or any director, officer, employee or agent thereof has engaged in any transaction or entered into a contract which is subject to § 5005 of this title and which would not have been approved had such approval been requested, the Commissioner may order the insurer to cease and desist immediately any further activity under that transaction or contract. After notice and hearing, the Commissioner may also order the insurer to void any such contracts and restore the status quo if such action is in the best interest of the policyholders, creditors or the public.

---

[49] The relevant portion of the current Section 5005 is substantively identical.

Further, under Section 5009(a):

> Whenever it appears to the Commissioner that any insurer . . . has committed or is about to commit a violation of this chapter . . . the Commissioner may apply to the Chancery Court for an order enjoining such insurer . . . from violating or continuing to violate this chapter . . . and for such other equitable relief as the nature of the case and the interest of the insurer's policyholders, creditors and shareholders or the public may require.

For purposes of this Motion, it is undisputed that IIC's guaranty of the Loan to RBE required the Commissioner's approval under Section 5005, and that IIC did not seek such approval.[50] There are several issues here. One is whether Section 5010 holds the Commissioner's exclusive tools to void or rescind transactions that failed to meet the approval requirements of Section 5005. If so, the second is whether the Court may decree an unapproved transaction invalid or unenforceable when the Commissioner, as Receiver, (a) has not formally requested the Court to implement a prior Section 5010 determination from the Commissioner, and (b) is attempting to nullify only portions of an unapproved package of transactions in a manner that benefits IIC but harms the other parties to those transactions.

I conclude that Section 5010 provides the Receiver's exclusive means to police the unapproved guaranty and security interest here. The Receiver, as Commissioner, has yet to act under Section 5010. Even if I were to read the

---

[50] Opening Br. 28; Answering Br. 42, 79-81.

Receiver's affirmative defenses in this case as invoking Section 5010, the appropriate remedy under that section would be to "restore the status quo," which would require voiding all the core relevant Loan transactions, not just IIC's guaranty and BB&T's security interest in the Loan's proceeds.[51]

I turn first to whether Section 5010 provides the exclusive means for the Commissioner to render transactions not compliant with Section 5005 "invalid [and] unenforceable" as the Receiver requests in this action.[52] "When a statute is silent as to the enforceability of contracts made by one who has not complied with the statute, the whole act and its purposes should be considered in determining whether the contract is enforceable."[53] Insurance company regulation is a statutory matter, with those statutes administered by the state insurance department.[54]

---

[51] The Receiver argues that the entire Loan transaction, in which Susquehanna loaned money to RBE which then flowed to IIC, and where the Loan was guaranteed and secured by IIC, required the Commissioner's approval. Answering Br. 86-87.

[52] Answer 30.

[53] *E. A. Strout Co. v. Howell*, 85 A. 666, 667 (Del. 1913).

[54] *See In re BCBSD, Inc.*, 2004 WL 2419161, at *13 (Del. Super. Ct. Oct. 4, 2004) (Slights, J.); *Beeber v. Walton*, 32 A. 777, 777-78 (Del. Super. Ct. 1887).

17

Chapter 3 of the Delaware Insurance Code outlines the Commissioner's general authority. It provides, in part, that "[t]he Commissioner shall enforce and execute the duties imposed by this title" and ". . . shall have the powers and authority expressly vested by or reasonably implied from this title." This broad grant of authority allows the Commissioner to do all that is "reasonably necessary" to execute her powers and duties. In addition to this broad grant of statutory authority, the Delaware Insurance Code addresses specific instances in which the Commissioner may exercise her regulatory powers.[55]

In *In re Montgomery Ward & Co., Inc.*, the District Court for the District of Delaware considered a request to void a contract that had not been approved as required by Illinois' Holding Company Systems Act (the "Illinois Act"), which is substantively identical to the relevant portion of Section 5005.[56] In that case, a party to an agreement with an insurance company sought to defend against a motion for summary judgment by arguing that the agreement was void because it had not been approved by the Illinois insurance director.[57] The defense also contended that the counterparty "knew or should have known" that the agreement was illegal and therefore unenforceable.[58]

On appeal from the bankruptcy court, the District Court noted first the purpose of the Illinois Act: "to protect the interests of current and future policyholders of

---

[55] *In re BCBSD, Inc.*, 2004 WL 2419161, at *7 (Del. Super. Ct. Oct. 4, 2004) (quoting 18 *Del. C.* § 310; *Dep't of Correction v. Worsham*, 638 A.2d 1104, 1107 (Del. 1994)).

[56] 344 B.R. 256 (D. Del. 2006).

[57] *Id.* at 257-58.

[58] *Id.* at 258.

Illinois insurance companies."[59]  In view of this purpose, the District Court found that the Illinois Act did not provide for the *per se* judicial invalidation of a contract that was not approved under the Act.[60]  Rather, the Act gave the Illinois insurance director discretion to declare a contract that violates the Act void.[61]  The District Court concluded that "the statutory scheme of the Holding Company Act expressly vests the [Illinois insurance director] with the authority to approve or disapprove contracts falling within the provisions of the Act and with the authority to determine the consequences of a violation of . . . the Act," and rejected the illegality defense.[62]  Similarly, the California Court of Appeal reviewed its statute, virtually identical to the Registration Act's relevant provisions, and ruled:  "[t]he fact that the [California] Insurance Holding Company System Regulatory Act creates a comprehensive scheme for administrative enforcement and a judicial remedy to enforce administrative action strongly suggests that the remedies provided are exclusive."[63]

In the absence of any Delaware authority on the subject, I am persuaded by the rationale of the District Court and California Court of Appeal.  I read Sections

---

[59] *Id.* at 259.

[60] *Id.* at 260.

[61] *Id.*

[62] *Id.*

[63] *Fremont Indem. Co. v. Fremont Gen. Corp.*, 55 Cal. Rptr. 3d 621, 645 (Cal. Ct. App. 2007).

19

5005, 5009, and 5010 to permit a noncompliant contract to still be enforceable absent action by the Commissioner. The General Assembly granted the Commissioner the ability and discretion under Section 5010(c) to enforce the Registration Act's approval requirements by ordering the insurer to "cease and desist . . . any further activity" related to unapproved agreements, and to "void any such contracts and restore the status quo if such action is in the best interest of the policyholders, creditors or the public." Section 5009 empowers the Commissioner to then seek this Court's assistance to enjoin ongoing violations or provide other relief where "it appears to the Commissioner" that an insurer has or will violate "this chapter or [] any rule, regulation or order issued by the Commissioner hereunder." The consequences for failing to obtain regulatory approval are set by statute, and the enforcement of those consequences is vested in the Commissioner.

I distinguish the Receiver's efforts in this litigation from its statutory power as Commissioner to void the contracts. Assuming, without deciding, that the Receiver appropriately invoked Section 5010(c) and asked this Court to enforce that decision through its affirmative defenses,[64] the Registration Act provides only one relevant remedy to the Commissioner, and by extension the Court, to deal with an

_____

[64] It is unclear whether the Receiver has appropriately ordered IIC to take the remedies outlined in Section 5010(c), or whether the statute's notice and hearing requirements are met by this litigation. But I need not reach those issues here.

20

unapproved transaction: "void [the offending contracts] and restore the status quo."[65] Here, BB&T, a third party, is attempting to enforce an unapproved security interest against IIC, an insurer, in delinquency proceedings. The Commissioner, as Receiver, wields that lack of approval like a shield and asks this Court to nullify BB&T's contractual security rights. But the Receiver also seeks to maintain IIC's benefit from the underlying bargain: the Loan proceeds.

The Loan Agreement, guaranties, and security interests were executed together in a package of transactions, as the Receiver acknowledges in its briefing.[66] The Receiver, as Commissioner, is not ordering IIC to void the Loan Agreement or its corollary transactions to return the parties to their status quo under Section 5010. Instead, it requests that the Court carve off and render unenforceable only BB&T's security interest in the Loan proceeds, so that IIC's estate may gain all the benefits of the Loan transaction without the cost of that encumbrance. The status quo in this case, however, would not be for BB&T to issue the loan without security—it would be for the Loan to have never issued at all. Because the statutorily required status quo would require reversing the core of the Loan package, not just the parts that the

---

[65] Section 5010(c)'s other relief of "order[ing] [IIC] to cease and desist . . . any further activity" is not applicable to these facts.

[66] Answering Br. 85-87.

21

Receiver does not like, I decline to find that Section 5010(c) enables the Receiver's relief as requested in its affirmative defenses.

The Receiver also claims Section 5009 creates an independent ground for equitable relief that renders Section 5010 nonexclusive and permits this Court to deny the Bank's motion. But Section 5009 permits the Commissioner to "apply to the Chancery Court for an order enjoining" an insurer that has not complied with the Registration Act from continuing to violate the Act. The Commissioner has not made any such application here. Rather, the Receiver raises broad equitable principles in an attempt to void rights asserted by a third party under a contract that is statutorily noncompliant. Section 5009 does not support this endeavor because Section 5010(c) specifically provides the remedy for policing compliance with Section 5005's approval requirements. Where Section 5010(c) delineates the carefully crafted mechanism to void contracts in this instance, I do not find Section 5009 to create a broader, more general tool for the Commissioner that supersedes that in Section 5010(c). Instead, Section 5009 may be used to enforce a determination made under Section 5010(c). The Bank's motion is GRANTED as to the Receiver's sixth and seventh affirmative defenses.

22

## III. CONCLUSION

BB&T moved for summary judgment to exclude the Receiver's affirmative defenses to the Complaint. I GRANT that Motion to the extent any of those affirmative defenses rely on the arguments addressed above, including unclean hands, quasi-estoppel, equitable subordination, failure to disclose materials to the Commissioner, and failure to obtain the Commissioner's approval.[67] The parties shall confer and provide a thorough status update on what issues currently remain for trial.

**IT IS SO ORDERED** this 15th day of May, 2019.

---

[67] For clarity, my decision here relates to the Motion and the parties' positions on that Motion. I do not intend to limit the Receiver's statutory duty to oversee IIC's liquidation, and do not reach in this decision whether the Receiver may take additional statutory actions, including under Section 5010(c) or otherwise, relating to BB&T's alleged failure to disclose materials to, and secure the approval of, the Commissioner.